STATE

v.

**Heldeberto LEMOS.**

No. 98–438–C.A.

Supreme Court of Rhode Island.

Jan. 11, 2000.

Jane McSoley, Aaron L. Weisman, Providence, for Plaintiff.

Randy Olen, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

Challenging the overall sufficiency of the evidence that was used to convict him and

the trial justice's rulings excluding or admitting certain evidence during his trial, the defendant, Heldeberto Lemos, appeals from a judgment of conviction on one count of first-degree sexual assault. Following a jury trial, he was sentenced to twenty years, ten to serve and ten suspended. After a prebriefing conference before a single justice of this Court, the parties were ordered to show cause why we should not resolve this appeal summarily without further briefing and argument. No such cause having been shown, we proceed to do so.

The defendant was indicted in 1997 for sexually assaulting a sixteen-year-old girl in violation of G.L.1956 § 11–37–2 and § 11–37–3.[1] On appeal, defendant questions the sufficiency of the evidence by challenging the denial of his motions for judgment of acquittal and for a new trial. He also claims the trial justice committed certain errors in his evidentiary rulings that warrant a new trial. We affirm the trial justice's denial of the defendant's motion for acquittal, but we remand the case for a new trial based on certain faulty evidentiary rulings by the trial justice.

### Facts

In December 1996, the victim (who shall remain nameless) began staying overnight at her cousin's apartment because of frequent fights with her parents. Her cousin, Taryn Jakeman (Taryn), was living with defendant (who was Taryn's boyfriend/fiancé) and their new baby (who was born on December 5, 1996). The victim testified that she was "best friends" with her cousin.

On the evening of December 29, 1996, the victim, Taryn, and defendant were celebrating the victim's birthday when they began drinking alcoholic beverages and watching a movie. The victim drank some beer, some Southern Comfort, and one glass of wine. She said that she was not inebriated, but explained that whenever "I get alcohol into my system, no matter what the amount is, I kind of feel like giddy and weak." At some point during the movie, defendant and Taryn had an argument, and Taryn took the baby into the bedroom. The victim and defendant watched the rest of the movie, and she then fell asleep on the couch. She awoke to hear defendant calling her name and asking her to come sit with him on the loveseat. She said she told him no, and that she was tired and was sleeping. She tried to go back to sleep, she said, but he came over, picked her up, and brought her over to the loveseat. Then, she testified, he put her head on his lap, turned her head toward his penis, and requested that she perform oral sex. She said no, and turned over and rolled onto the floor. However, she asserted, he picked her up again and brought her over to the couch, and again asked her to perform oral sex.

The victim testified that she continued to say no and kept turning her head away. However, she asserted, defendant then turned her over, put his hands up inside her shirt to feel her breasts, and pulled her pants and underwear down. Next, he got on top of her and put his penis inside her. She did not struggle or call out for help, she testified, because she had once before been sexually assaulted by a boy in her school, and during that incident "I struggled and it hurt a lot, and I bled for like a week after that. And my cousin and I, Taryn, were best friends and I didn't want her to get hurt." She explained that "I might have squirmed a little, but I

---

1. General Laws 1956 § 11–37–2 reads in pertinent part:

 "**Definition of guilt of first degree sexual assault.**—A person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if any of the following circumstances exist:

 \* \* \*

 (2) The accused uses force or coercion."

 Section 11–37–3 reads in pertinent part:

 "**Penalty for first degree sexual assault.**— Every person who shall commit sexual assault in the first degree shall be imprisoned for a period not less than ten (10) years and may be imprisoned for life."

wasn't like trying to like push him off me or anything." After he finished with her, defendant pulled up her sweat pants and underwear and left her lying on the couch. As he left the room she claimed he told her that the next time would be better. After he left, she "just went to sleep."

The victim also recounted a conversation she had previously engaged in with Taryn before this incident, in which Taryn explained that she and defendant had not had sexual relations since the baby was born. The defendant objected to the admission of this testimony, but was overruled. According to the victim, Taryn told her that she and defendant were waiting until New Year's Day to have sex. Furthermore, according to the victim, Taryn told her that defendant had been complaining because Taryn would not have oral sex with him in the meantime.

The victim also referred to a previous sexual assault that she had described earlier by explaining her lack of resistance in this instance. She stated that, in the spring of 1996, a classmate at LaSalle Academy had assaulted her. She did not tell anyone about the assault at that time because she was embarrassed and did not want anyone to know about it. As a result of that incident, she became depressed, her grades in school fell, and she began running away from home. In the fall of 1996, she transferred to Bayview Academy after she learned that her classmate still would be attending LaSalle Academy.

The morning after the incident with defendant, the victim said, she pretended nothing had happened because, she explained, she did not feel that she could tell her cousin Taryn about it. Later that day, however, she told her boyfriend, Jason Rose (Jason) what had happened. Although he wanted her to go to the authorities, she was reluctant because she "was afraid it would ruin our family." A few days later, she was crying a lot and considering suicide, so Jason and her parents took her to Rhode Island Hospital, where she spoke with a doctor and a social work-er. From there, she was admitted to Butler Hospital. Several days after being admitted, she began telling people what had happened. Eventually her parents learned about it, and then the victim told Taryn and Taryn's parents. Although Taryn appeared to be supportive at first, a few days later she seemed to have lost faith in the victim's account. The victim testified that her uncle, Taryn's stepfather, also doubted her story; since that time, she has had virtually no contact or relationship with Taryn or her uncle.

Doctor Louis Hafken, a psychiatrist, testified that he treated the victim at Butler Hospital beginning in early January 1997. He diagnosed her as having a major depressive disorder, with "suicidal ideations." Although initially she seemed to improve after disclosing the alleged assault to her parents and her cousin, when the victim concluded that Taryn did not believe her account of what happened she became disappointed and more depressed.

Jason, the victim's boyfriend, also testified. He said that December 29th was his birthday, and the victim had been with him earlier in the day. Taryn and defendant picked the victim up at his house so she could spend the night with them. Jason said he talked to her later that night, and then again the next morning. He testified that he could tell something was wrong. When he saw her later that afternoon she looked pale and upset, and seemed to be in a daze. At first, she would not tell him what was wrong, but after a while disclosed that defendant had sexually assaulted her. She was crying and upset when she told him.

Jason further testified that he went to Rhode Island Hospital with the victim a few days later, and was in the room when she was talking to a social worker. The victim refused at that time to tell anyone else what had happened because of her concern that it "would break her family apart, and because of what happened before in May." Jason told the social worker

that defendant had "made passes at" the victim. He used those words, he said, because he knew the victim did not want to tell anyone what really happened, and he felt she trusted him not to say more.

After the state rested, the defense introduced Jared Magiera, the alleged perpetrator of the assault in May, as a witness.[2] He testified that he knew the victim from LaSalle Academy, and had talked to her on the phone a few times. He said that he never went out on a date with her, never had sexual intercourse with her, and never sexually assaulted her.

Jane Ferguson, a licensed social worker at Hasbro Children's Hospital, testified that she interviewed the victim on January 3, 1997. At that time, the victim was withdrawn and not talkative; her affect was flat and many of her responses consisted of nonverbal gestures such as nods or shrugs. The victim also expressed thoughts about hurting herself, and had feelings of hopelessness as well as frequent nightmares, according to the social worker. Ferguson learned that the victim had been sexually assaulted approximately eight months before the interview, but the victim did not mention a more recent sexual assault by defendant. Jason was in the room with the victim during the interview, and he volunteered that about a week earlier, the victim had consumed some alcohol at her cousin's house, and her cousin's fiancé "had made passes" at her while she was under the influence of alcohol. In response to this information, the victim nodded her head in the affirmative, according to the social worker. After the interview, Ferguson recommended hospitalization for the victim because she was concerned for the victim's safety.

Edward Domenicci, the victim's uncle and godfather and Taryn's stepfather, also testified for the defense. He opined that the victim was not a truthful person.

Next, Taryn testified. On the night in question, she recounted, she went into her bedroom when the movie they were watching was almost over. She said that defendant came to bed about half an hour later, and that during the intervening time she "never really slept." She further testified that, early the next morning, the victim was fooling around and joking with defendant as usual. Approximately a week later, Taryn went to visit the victim in Butler Hospital. During that visit, the victim told her that defendant had forced himself on her, and that she had concluded that "she must have been raped because her underwear was on one leg when she went to the bathroom." Taryn testified that the victim told her she was "out of it" and "very limp" at the time, because of her consumption of alcohol. A few days later, Taryn went back to visit the victim, and this time the victim denied that she had been intoxicated at the time of the incident.

Taryn also testified that sometime in late December 1996, before this incident occurred, she had a conversation with the victim while they were driving in a car. During that conversation, Taryn said, the victim mentioned that defendant seemed "stressed out," and that perhaps Taryn should perform oral sex on him. When Taryn responded that she would not do that, the victim said she would be willing to do so if Taryn had no objection.

Taryn also testified on cross-examination that although she no longer had a romantic relationship with defendant, she was friends with him, and he periodically visited their daughter. She also said that he was still paying some of the rent for her

---

**2.** The trial justice initially ruled that Jared Magiera could not testify for the defense. However, just before the attorneys made their opening statements, he reversed that pretrial ruling after reconsidering it. A voir dire of the witness was conducted outside of the presence of the jury, in which he denied sexually assaulting the victim or ever having any sexual relations with her. During cross-examination of the victim, the trial justice cautioned the jury that the victim's allegation of a sexual assault by Jared Magiera was not part of the case before them.

apartment. She was not permitted, however, to answer a question about whether he was providing child support.

Ultimately, the jury found that defendant was guilty as charged. After he was sentenced, he filed a notice of appeal. On appeal, he contests the denial of his motions for judgment of acquittal and for a new trial. He also challenges certain evidentiary rulings by the trial justice, including: (1) the denial of his pretrial motion to preclude reference to the parties' use of alcohol, particularly because it was undisputed that no one was intoxicated; (2) the exclusion of evidence from Butler Hospital records that he claims would "flatly contradict and impeach [the victim] by establishing that she had * * * initiated flirtations with several other patients at Butler"; (3) the exclusion of statements by the victim to her parents regarding a contradictory version of events; (4) the admission of hearsay evidence in an attempt to demonstrate that defendant had not engaged in sexual relations for some time because of Taryn's pregnancy and childbirth; and (5) the restriction of cross-examination.

### Analysis

■ In reviewing a motion for judgment of acquittal, this court applies the same standards as the trial court. *State v. Suero*, 721 A.2d 426, 427–28 (R.I.1998). The court "must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility and draw all reasonable inferences that are consistent with guilt." *Id.* at 428 (quoting *State v. Henshaw*, 557 A.2d 1204, 1206 (R.I.1989)). "Unless the evidence, when viewed in such a light, is insufficient to warrant a verdict of guilty beyond a reasonable doubt, the motion should be denied." *Id.* When reviewed under these standards, the evidence in this case, we conclude, was sufficient to support the jury's verdict. Though defendant is correct in pointing out that the victim's testimony was the only direct evidence of his guilt, her evidence, in addition to the

testimony given by others at the trial, was sufficient to allow the jury to draw reasonable inferences to substantiate defendant's guilt. Therefore, we reject defendant's argument challenging the denial of his judgment-of-acquittal motion.

■ With respect to defendant's challenges to the trial justice's various evidentiary rulings, determinations of relevance generally lie within the discretion of the trial justice, and such determinations will be "reversed on appeal only for abuse of that discretion." *State v. Martinez*, 651 A.2d 1189, 1193 (R.I.1994); *State v. Marini*, 638 A.2d 507, 516 (R.I.1994). The evidence that was admitted concerning the parties' consumption of alcohol does not appear to have been prejudicial to defendant, and actually may have been helpful to the jury's understanding of what occurred on the evening in question. Thus, we find no reversible error here.

■ Concerning the exclusion of the victim's Butler Hospital records, however, we are of the opinion that the trial justice erred in precluding their admission into evidence on hearsay grounds. During cross-examination, defense counsel asked Dr. Hafken whether he was "aware of a concern on behalf of the nurses that [the victim] was developing inappropriate relationships with male personnel." When Dr. Hafken consulted the nurses' notes to which defense counsel referred, he interpreted the notes as merely indicating that the victim appeared to be developing a relationship with a male person on the unit, and that she continued to be friendly with that person. According to Dr. Hafken, nowhere in the notes was there any indication that the victim's relationships were inappropriate. However, the hospital records should not have been excluded as hearsay because they were records "kept in the course of a regularly conducted business activity" and thus qualified under the business-records exception to the hearsay rule. *See* R.I. R. Evid.

803(6).[3] There was sufficient evidence that these records satisfied the requirements of Rule 803(6) in that they were made "at or near the time by, or from information transmitted by, another person with knowledge." *Id.* The hospital records were prepared by nurses on the psychiatric unit where the victim stayed and reflected their daily observations about the victim's behavior. Further, Dr. Hafken was qualified as a witness to lay the foundation for the introduction of the records as a "custodian or other qualified witness." *Compare State v. Carrera,* 528 A.2d 331, 336 (R.I.1987) (holding that a discharge summary was inadmissible under Rule 803(6) because, among other things, "[t]here was * * * no testimony from any custodian of hospital records regarding the preparation of such summaries") *with International Brotherhood of Electrical Workers, Local No. 99 v. United Pacific Insurance Co.,* 573 A.2d 270, 272 (R.I.1990) (holding payroll records admissible under Rule 803(6) though foundation was laid by witness who only stored the files but did not actually prepare or maintain them). Because Dr. Hafken was knowledgeable about the preparation of these records and their use in the course of the hospital's business, he was capable of identifying them sufficiently to satisfy the prerequisite for their admission as business records. As a result, the trial justice erred in excluding these documents on hearsay grounds.[4]

The defendant next argues that the trial justice erred in excluding the victim's statements to her parents that would have provided the jury with a contradictory version of the events on the night in question. Here, defendant apparently refers to the testimony of the social worker at Hasbro Children's Hospital, Jane Ferguson, who testified as follows about the victim's admission to the hospital emergency room:

"Q And you next met with [the victim's] parents, separate and apart with [*sic*] [the victim]?

"A Yes

"Q That would have been in family conference room? What did they tell you?

"MS. SOCCIO: Objection.

"THE COURT: Sustained.

"MR. ROY: The statements of the medical treatments and diagnosis.

"THE COURT: The ruling will stand. I sustained it."

Absent any offer of proof, it is unclear exactly what statements of the victim to her parents defendant is referring to here and whether such statements would have contradicted the victim's in-court testimony. In any case, testimony about these statements would appear to have constituted impermissible hearsay (what the victim's parents allegedly told the social worker about what the victim allegedly said to them) and they therefore would have been inadmissible in any event.

---

3. Rule 803 of the Rhode Island Rules of Evidence reads in pertinent part as follows:

"**Hearsay exceptions; * * ***
(6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, another person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of informa-

tion or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

4. In his Rule 12A statement, defendant characterizes the hospital records as "establishing that [the victim] had * * * initiated flirtations with several other patients at Butler * * *." We make no determination as to whether the records were admissible for this or for any other purpose. We hold only that the trial justice erred in excluding them on hearsay grounds.

Thus we are unable to sustain defendant's appeal on this basis.

 Next, defendant asserts that the trial justice erred in allowing "gratuitous, irrelevant hearsay in an attempt to demonstrate that [the defendant] had not engaged in sex for some time * * *." The victim was asked whether defendant and Taryn were celebrating anything in particular on the night the alleged assault occurred. The following exchange ensued:

"A No. Taryn mentioned that they were waiting until New Year's.

"Q For what?

"A To have sex.

"MR. ROY: Objection, your Honor. Move to strike.

"THE COURT: Basis.

"MR. ROY: Hearsay, irrelevant.

"THE COURT: Overruled.

"Q And why was that?

"A Because since Taryn had the baby, and she was like sewn up, they hadn't had sex."

The prosecutor then asked the victim whether she had ever had a conversation with defendant about oral sex. When she replied "No," the questioning continued as follows:

"Q Was there a conversation between you and Taryn about oral sex and the defendant?

"A Yes.

"Q And what was that about?

"A [Defendant] was complaining about how Taryn wouldn't have oral sex with him, and she had done it with some other guys, and this is someone that she's going to marry, and she wouldn't do it to him. And Taryn was saying, Well, I just don't like to do it, or whatever. And where I came into the conversation, I was saying, Well, you have to respect that, if she doesn't want to, but I wouldn't understand why she would do it with all other guys and

not with the person she's going to marry."

 The state argues that this testimony was "extremely relevant and probative" concerning motive. It may well be that this evidence was relevant to prove defendant's motive, but nonetheless it was also inadmissible hearsay because it was offered to prove the truth of the statements contained therein relative to the lack of sexual relations between defendant and Taryn and to defendant's conduct in response to this situation. Moreover, these statements did not fit under any specific hearsay exception under Rule 803. *See* R.I. R. Evid. 801(c); *Manuel J. Furtado, Inc. v. Sarkas*, 118 R.I. 218, 224, 373 A.2d 169, 172 (1977) (noting "the rule barring the use of hearsay evidence applies only to an out-of-court utterance which is being offered for the purpose of establishing the truth of the matter contained therein"). Because this was a case that turned on the credibility of the victim and the accused, we are unable to say that the improper admission of this evidence was harmless error. "[A]dmission of hearsay testimony at a criminal trial, while error, is not necessarily prejudicial to a defendant's cause thereby necessitating revers[al]." *State v. Tatro*, 659 A.2d 106, 113 (R.I. 1995). *See also State v. McKone*, 673 A.2d 1068, 1075 (R.I.1996) (although admission of hearsay was error, it was harmless error in light of other support for trial justice's findings in record). The specific testimony that defendant objected to was that, according to what Taryn allegedly told the victim, defendant and Taryn had not been having sex with each other, and defendant had been complaining about this fact to Taryn. Given that the alleged sexual assault occurred during this period, the admission of this hearsay may well have affected the jury's evaluation of the evidence.

 Finally, the defendant contends that his cross-examination was unduly limited. However, he does not indicate what cross-examination he is referring to,

or what effect any such limitation may have had on the verdict. Once cross-examination sufficient to meet constitutional guarantees has been permitted, then the scope of cross-examination lies within the sound discretion of the trial justice. *See State v. Peterson*, 722 A.2d 259, 262 (R.I. 1998) (ruling that "[t]he exercise of that discretion will not be disturbed absent a showing of clear abuse, and then only when such abuse constitutes prejudicial error"). A review of the record reveals no area in which the trial justice abused his discretion by unduly limiting cross-examination by defense counsel.

### Conclusion

We are of the opinion that the judgment in this case must be vacated and the papers remanded for a new trial because of the above-specified evidentiary errors that may have affected the jury's return of a guilty verdict. The trial justice should not have excluded the Butler Hospital records on hearsay grounds, nor should he have allowed the victim to testify about what Taryn told her concerning what defendant had said to Taryn. Taryn's out-of-court statements to the victim were offered for the truth of the assertions contained therein and should have been excluded as hearsay. As a result, we have no need to reach the defendant's arguments concerning the denial of his new trial motion. For these reasons, we sustain the appeal, vacate the conviction, and remand for a new trial.