## STATE

v.

### Kenneth S. RICE.

No. 98–488–C.A.

Supreme Court of Rhode Island.

July 7, 2000.

Jane M. McSoley, Aaron L. Weisman, Providence, for Plaintiff.

Paula Lynch Hardiman, Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Severance versus joinder of multiple sexual-wrongdoing charges: this is the key legal battleground for the appeal of the defendant, Kenneth S. Rice (Rice) from his criminal convictions. The trial justice denied Rice's motion to sever one or more counts of the six-count indictment against him for various acts of sexual misconduct directed against two minor children. Granting the motion would have required the state to conduct separate trials on the severed charges. On appeal, Rice urges us to reverse his conviction because he asserts that the trial justice improperly denied his severance motion, thereby permitting the state to join all the counts against him in one trial. He contends that, by failing to sever certain of the counts for a separate trial, the trial justice permitted the state to introduce highly prejudicial bad-character evidence against him throughout his trial that otherwise would not have been admissible. Rice also argues that the trial justice committed reversible error when he denied him access to supposedly discoverable information concerning a complaining witness's medical and psychiatric records because these documents may have contained exculpatory evidence. Finally, Rice suggests that the trial justice erred by refusing to allow a nurse practitioner who conducted a gynecological examination of one of Rice's victims to testify concerning the absence of any physical evidence that would corroborate his alleged sexual molestation of this victim. Rice argues that the cumulative effect of these alleged errors deprived him of his right to a fair trial and violated his witness-confrontation rights under the Sixth Amendment to the United States Constitution and under article 1, section 10, of the Rhode Island Constitution. For the reasons asseverated below, we affirm the convictions on all counts and deny Rice's appeal.

### Facts and Travel

After Rice's 1998 trial, a jury returned a guilty verdict on each of the six counts in the indictment: three counts of first-degree child molestation sexual assault, one count of second-degree child molestation sexual assault, and two counts of solicitation with the intent to commit a felony. The trial justice then sentenced Rice to life imprisonment for count 1 (first-degree child molestation sexual assault), to run consecutively to a previously imposed twelve-year sentence Rice was serving as a result of his probation violation after a previous conviction for second-degree child molestation sexual assault. Rice also received concurrent fifty-year sentences for his convictions on counts 2 and 3 (both involving first-degree child molestation sexual assault). On count 4 (second-degree child molestation sexual assault), the court sentenced Rice to ten years (consecutive to count 1's life-imprisonment sentence), and on counts 5 and 6 (the solicitation counts) he received concurrent sentences of five years each. Declaring Rice a habitual offender, the court finally sentenced him to an additional ten

years to run consecutively to the sentences it had imposed previously. The trial justice further ruled that Rice would not be eligible for parole for thirty years.

The indictment's six counts related to four separate incidents of alleged sexual crimes committed at three separate locations and against two different victims, whom we shall call Mary and Cindy,[1] both of whom were minors when the incidents occurred. All six counts covered a period of approximately twenty months.

## The Assaults in the Hope Valley Barn

The incidents described in counts 1 through 3 pertained to a single encounter between Rice and Mary in April 1992, in which Rice engaged in three acts of first-degree child molestation sexual assault.[2] Mary, who was approximately ten years old at the time, lived with her mother, her brother, and her eventual stepfather (Rice) in Hope Valley, Rhode Island. On the day of these incidents, she was working on a school project in the family barn. Her teacher had assigned each of the students to construct a birdhouse. Mary testified at trial that Rice entered the barn and offered to help her build it.

But instead of helping Mary to build the birdhouse, Rice asked the girl to go upstairs to the barn's loft. There, Rice removed his clothes, made her do the same, and then engaged in sexual intercourse with her. When Mary told him "it hurt," he then penetrated her with at least one of his fingers. He then forced her to perform fellatio. Rice finally stopped assaulting her when he heard a car pull into the driveway. Before leaving the barn, however, he threatened Mary: "Don't tell your mom because if you do, I'm going to make your life hell and kill her." Taking him at his word, she remained silent for approximately four years.

## The Solicitations in the First Westerly Apartment

Mary's mother married Rice in March 1993, and, a few months later, the family moved to a second-floor apartment in Westerly. Now twelve years old, Mary became friendly with thirteen-year-old Cindy who lived on the first floor of the building with her mother, stepfather, and brothers. The two girls visited each other every day on either the first or the second floor.

Although the family's stay at this apartment was relatively brief, it still afforded Rice the opportunity to solicit both these young girls for sex. Both Mary and Cindy testified at trial that Rice offered them money to perform sexual acts. Mary testified that Rice offered to pay her $15 to "jerk [him] off." She also heard him offer Cindy $20 if she would "sleep with [him]." Cindy testified that, on one occasion, Rice offered her $20 to perform fellatio, and on another occasion, he offered her $5 for a kiss. Mary testified that both she and Cindy refused these offers. Based upon two of these requests, counts 5 and 6 of the indictment charged that Rice had solicited Mary and Cindy to join him in the commission of various sexual acts: in the case of Mary, second-degree child molestation sexual assault (count 5)[3] and in the case of Cindy, first-degree child molestation sexual assault (count 6).[4]

## The Bedroom Assault in the Second Westerly Apartment

Finally, count 4 of the indictment charged Rice with second-degree child mo-

---

1. To protect their true identities, we use fictitious names for the victims.

2. The state alleged that the encounter pertaining to counts 1 through 3 occurred between April 1992 and August 1993.

3. The state alleged that the solicitation pertaining to count 5 occurred between August 1993 and June 1994.

4. The state alleged that the solicitation pertaining to count 6 occurred between August and December 1993.

lestation sexual assault on Mary.[5] In December 1993, the family moved to another apartment in Westerly. To use the bathroom in this apartment, Mary had to walk through either her brother's bedroom or the bedroom that Rice and her mother used. Mary testified that on two or three occasions when she attempted to gain access to the bathroom through her mother's bedroom, Rice grabbed her, threw her down on the bed, and groped her breasts over her clothes. Yet Mary still remained silent, she testified, because she was "always afraid" that Rice "would hurt [her] mom."

Her brother testified at trial that he was always suspicious that something untoward may have happened between Rice and his sister. He noted that Mary would act strangely and sometimes burst into tears at the mere mention of Rice's name. In October 1995, still curious, her brother asked her if anything ever had happened between her and Rice. Mary finally gathered the courage to reveal Rice's assaults to her brother, but she begged him not to tell their mother. Nonetheless, Mary's brother eventually informed their mother that Rice had molested Mary. Mary's mother then brought her to the State Police barracks in Hope Valley, where Mary revealed Rice's two-year campaign of molestation and sexual solicitation.

Later that month, Darrell Superczynski (Superczynski), a child protective investigator with the Rhode Island Department of Children, Youth and Families, interviewed Mary. She told him she and Rice had engaged in oral sexual relations together and that he also had engaged in sexual intercourse with her. She also told him that Rice sometimes "had her touch him" in the groin area.

Lori Muddiman (Nurse Muddiman or Muddiman), a nurse practitioner with a specialization in pediatrics and coordinator of the Child Safe Program at Hasbro Hospital, interviewed Mary approximately two weeks later and examined her gynecologically. At that time, according to Nurse Muddiman, Mary denied having engaged in oral sex with Rice, although she acknowledged that Rice had sexual intercourse with her.

Additional facts will be supplied as necessary throughout this opinion.

## Analysis

### I

### Denial of The Motion to Sever

Rice claims on appeal that the trial justice erred in denying his motion in limine to sever certain counts of the indictment for separate trials. He contends that the court's failure to sever the charges against him allowed the state to use prejudicial "spillover" evidence in support of the various charges to bootstrap its case against him when it did not have proof beyond a reasonable doubt on each of the charges separately. According to Rice, the trial justice should have severed either the two solicitation counts from all the other counts, or at least he should have severed the sole solicitation count relating to Cindy from the five counts relating to Mary. We reject both contentions.

Rule 8(a) of the Superior Court Rules of Criminal Procedure permits the state to join multiple offenses in a single indictment if the offenses charged are "of the same or similar character." Furthermore, Rule 8(a) provides that offenses may be joined when based "on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." Because proper joinder under Rule 8(a) is a matter of law, we review de novo whether the state properly joined one or more charges in a single indictment against a single defendant. *See State v. Trepanier,* 600 A.2d 1311, 1316 (R.I.1991).

---

5. The state alleged that the incident pertaining to count 4 occurred between August 1993 and June 1994.

Here, we conclude that each of the counts was of a sufficiently similar character to warrant joinder. Each count related to actual sexual assaults or requests to commit sexual assaults upon either one or the other of two young girls who, when they lived together in the same building, were subjected to Rice's sexual molestations and/or solicitations. In reviewing de novo whether the solicitation counts warranted joinder with the other counts in a single indictment, we note that each count within the indictment related to alleged child molestation sexual assault or to solicitation thereof. The mere fact that counts 5 and 6 involved Rice's requests for sexual acts, as opposed to counts 1 through 4 that involved actual sexual encounters, was insufficient, in our opinion, to require severance. And the mere fact that one of the solicitation counts involved Cindy instead of Mary was also insufficient to require the trial justice, as a matter of law, to have severed that count from the others under Rule 8(a). Each and every count in this indictment related to Rice's sexual assaults or solicitations for sexual acts upon one or the other of these two young girls when they were present on the premises where Rice then resided. Therefore, they were all "of the same or similar character." Super.R.Crim.P. 8(a).

Concluding that the charges within a single indictment were properly joined, however, does not end our inquiry. Indeed, even in cases in which the trial justice denies a motion to sever because Rule 8(a) is satisfied, a trial justice still should exercise his or her sound discretion to decide whether severance is nevertheless appropriate, notwithstanding proper joinder under Rule 8(a). "[A] defendant may certainly move for severance of some of the indictment counts for the purposes

of trial when he [or she] is able to show such prejudice as might constitute a denial of his [or her] right to a fair trial, pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure." [6] *State v. King*, 693 A.2d 658, 663 (R.I.1997) (quoting *State v. LaRoche*, 683 A.2d 989, 998 (R.I.1996)). Therefore, the grant or denial of a motion for severance under Rule 14 is not a matter of right, and we will not disturb a trial justice's decision on a motion to sever unless he or she has abused his or her discretion. *See King*, 693 A.2d at 663.

Moreover, a defendant must demonstrate a clear abuse of that discretion, resulting in substantial prejudice to and impingement upon his or her right to a fair trial. *See State v. Whitman*, 431 A.2d 1229, 1232–33 (R.I.1981). Showing a mere potential for prejudice or even the likelihood of prejudice will not suffice. *See State v. Sharbuno*, 120 R.I. 714, 719, 390 A.2d 915, 918 (1978). Indeed, this Court has upheld a trial justice's decision not to sever counts when the defendant demonstrated that the failure to do so created only a mere disadvantage to him at trial. *See State v. Bernier*, 491 A.2d 1000, 1003 (R.I.1985).

Here, we are of the opinion that the trial justice properly exercised his discretion when he denied the motion to sever. First, the trial justice decided against a severance because all the events at issue occurred within what he considered to be a reasonably condensed time frame of twenty months.[7] Second, as he correctly noted, the places where the crimes allegedly occurred all were in relative geographical proximity to one another. Finally, the trial justice concluded that the substance of each solicitation count was similar in character to the other counts, thereby

6. Rule 14 of the Superior Court Rules of Criminal Procedure provides, in relevant part:

"If it appears that a defendant or the State is prejudiced by a joinder of offenses * * * in an indictment * * * or by such joinder

for trial together, the court may order an election or separate trials of counts * * * or provide whatever other relief justice requires."

7. At one point, the trial justice mistakenly referred to this time span as four months.

making severance unnecessary. Based upon our review of the record and the similarities among each of the offenses charged in the indictment, we also cannot say that Rice demonstrated substantial prejudice resulting from the trial justice's failure to sever any of these counts.

Furthermore, all of the counts against Rice alleged that when the opportunity arose, he sexually assaulted or solicited sex from the young girls who lived in or who were present on the property where he resided. Indeed, when Mary's friendship resulted in Cindy's visiting with her in Rice's apartment, he solicited sexual favors from Cindy as well. The fact that three different crimes were involved—first-degree child molestation sexual assault, second-degree child molestation sexual assault, and solicitation for the victims to commit these two offenses—did not create a mishmash of unrelated offenses. Rather it tended to demonstrate Rice's continued pattern of lewd behavior towards these two young girls with whom he had frequent contact at or inside his home. *See LaRoche*, 683 A.2d at 998 (upholding denial of severance where each of the counts involved allegations against the defendant that were all the same or of a similar character, " 'inextricably intertwined with [a] common scheme and design' ").

We have also stated that in cases in which the outcome would have been the same had separate trials been held, we will not disturb the trial justice's decision not to sever, even when the defendant may have suffered some disadvantage in defending against the joined counts simultaneously. *See Sharbuno*, 120 R.I. at 719, 390 A.2d at 918. And when, as here, the evidence related to each one of the counts is straightforward, simple, and distinct, this circumstance argues in favor of upholding the trial justice's denial of a motion to sever. *See id.* Here, Mary and Cindy testified to the events concerning Rice's conduct toward each girl personally. The evidence used to distinguish between the different times, places, and victims involved was also sufficiently clear and distinct. Although the counts were similar in nature and character for purposes of joinder, our review of the record also convinces us that the state proved each count with sufficiently discrete evidence to avoid any jury confusion or substantial prejudice caused by "spillover" evidence.

## II

## Admission of Uncharged Evidence of Prior Bad Acts

Rice next contends that the trial justice's failure to sever certain counts for separate trials caused him to suffer the type of prejudice that Rule 404(b) of the Rhode Island Rules of Evidence seeks to avoid.[8] He contends that the trial justice improperly admitted such evidence and, as a result, allowed the state to portray him as a lecherous drunk whose bad character alone was sufficient to convict him on all counts. First, Rice argues that the misjoinder of the solicitation count pertaining to Cindy (notwithstanding proper joinder under Rules 8(a) and 14) enabled the state to introduce "spillover" evidence of Rice's general bad character that violated Rule 404(b). Rice claims that the state introduced the evidence about Rice's solicitation of Cindy to bolster Mary's credibility and thereby establish proof beyond a reasonable doubt of all counts in the indictment. Second, Rice contends that the court violated Rule 404(b) when it allowed the state to introduce his statement to the girls that, "I can't help it if I like pretty thirteen-year-old girls." Third, he claims that Rule 404(b) should have barred evidence showing that, in the first Westerly apartment,

---

**8.** Rule 404(b) of the Rhode Island Rules of Evidence provides in pertinent part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident."

Mary caught Rice peering through a pencil-sized hole in the wall separating the laundry room from the bathroom while she was showering. Finally, Rice contends that Rule 404(b) should have barred the admission of testimony that he arranged for Mary and Cindy to sit on a washing machine, that he then turned it on, rested his hands on their legs, and asked them whether the washing machine's vibrations "felt good." We address each contention in turn.

## A. The Admission of So-called "Spillover" Evidence

Although Rule 404(b) bars admission of evidence of "other crimes, wrongs, or acts * * * to prove the character of a person in order to show that the person acted in conformity" with that character trait, such evidence is admissible if it is offered for other proper purposes. *See State v. Clark,* 754 A.2d 73, 79 (R.I.2000). But we have warned trial justices to use extreme caution when admitting evidence of an accused's similar sexual offenses in cases such as this one. Thus, in *State v. Jalette,* 119 R.I. 614, 627, 382 A.2d 526, 533 (1978), we held that

> "evidence of other not too remote sex crimes *with the particular person concerned in the crime on trial* may be introduced to show the accused's 'lewd disposition or * * * intent' towards the person, (2) evidence that the accused committed nonremote similar sexual offenses *with persons other than the victim* may be admitted to prove the presence of the traditional exceptions to the general rule, such as intent or motive, with a caveat that the evidence of other acts with other persons may be shown on the issue of intent only if it is absolutely necessary * * *, and (3) any doubt as to the relevancy of such evidence should be resolved in favor of the accused." (Emphases added.)

Applying these principles in *State v. Pignolet,* 465 A.2d 176, 180 (R.I.1983), this Court held that testimony concerning the defendant's uncharged sexual misconduct toward the victim's sister was admissible to demonstrate "an ongoing pattern of behavior that [the] defendant exhibited toward both of his young stepdaughters." Since *Pignolet* we have held that evidence of the defendant's sexual misconduct with persons other than the victim is also admissible under certain limited circumstances when it tends to establish that the charged misconduct was part of a common scheme or plan directed against victims under the defendant's control. *See, e.g., State v. Hopkins,* 698 A.2d 183, 185 (R.I. 1997) (holding that the uncharged sexual-misconduct evidence was relevant to show that the defendant, under circumstances when he was able to exert some degree of control over his young victims, had the motive, intent and plan to sexually abuse children of a similar age); *State v. Lamoureux,* 623 A.2d 9, 13 (R.I.1993) (holding that the trial court properly admitted evidence of an uncharged assault under the "common design" and "absence of mistake" provisions of Rule 404(b)).

 Nevertheless, in this case, Cindy's and Mary's testimony to prove Rice's alleged sexual solicitation of Cindy (count 6 of the indictment) did not constitute Rule 404(b) evidence at all. For instance, Mary's testimony that Rice solicited Cindy to "sleep with [him]" was evidence that the state had to present to establish the required elements of the count 6 solicitation charge against him involving Cindy. *See, e.g., Clark,* 754 A.2d at 80 (holding that "prejudicial evidence relating to other bad conduct is admissible if it is relevant to prove an important element in the state's case"). Furthermore, during the time period alleged in count 6 of the indictment, Cindy lived in the same building with Rice and his stepdaughter. And the occasions when he solicited Cindy for sex overlapped with the period when he likewise solicited Mary. Thus, Cindy's and Mary's testimony concerning Rice's sexual solicitations of Cindy did not constitute Rule 404(b) evidence at all, but instead constituted the

state's attempt to support the single solicitation count involving Cindy. As such, the evidence was admissible on that ground alone and did not require justification under Rule 404(b). *See State v. Waite*, 665 A.2d 1338, 1339 (R.I.1995). And even assuming, for the sake of argument, that the testimony concerning Rice's solicitation of Cindy had constituted uncharged sexual-misconduct evidence vis-à-vis the charges against Mary, it still was relevant to proving these latter charges because it constituted evidence of Rice's lewd disposition toward young girls who were present in his household and of his motive, intent, and plan to abuse them sexually when the opportunity to do so arose. *See Pignolet*, 465 A.2d at 179–80.

B. *The Statement Concerning Rice's Attraction to Pretty Thirteen–Year–Old Girls*

The defendant argues that Rule 404(b) also barred admission of his statement, "I can't help it if I like pretty thirteen-year-old girls," because it was propensity evidence that was highly prejudicial. According to Rice, such bad-character evidence portrayed him as an overall bad person who therefore must have been guilty of the charges. Rice further argues that even if we rule that this statement was admissible, the trial justice, at a minimum, erred when he failed to give the jury a limiting instruction on the proper use or uses of this evidence.

■■■ We believe that Rice's reliance on Rule 404(b) to exclude this statement is again misplaced. To trigger the application of Rule 404(b), a party must attempt to present evidence of "other crimes, wrongs, or acts" to "prove the character of a person in order to show that the person acted in conformity" with that particular character trait. The contested statement in this case, however, was neither another crime, a wrong, nor a bad act, and therefore Rule 404(b) was simply inapplicable. *See State v. Yelland*, 676 A.2d 1335, 1339 (R.I.1996).

In *Yelland*, a jury convicted the defendant of first-degree child molestation sexual assault. On appeal, he challenged on Rule 404(b) grounds the admission of evidence that he slept in the same bed with his daughter. 676 A.2d at 1339. Rejecting this argument, we held that Rule 404(b) was not pertinent at all because the testimony did not constitute evidence of "other crimes." *Id.* It was, however, relevant to the defendant's relationship with his daughter and to the charge that he had molested her; thus, the trial justice properly exercised his discretion in admitting it. See *id.* at 1340.

■■■ Here, Cindy's testimony that Rice stated he "like[d] pretty thirteen-year-old girls" did not concern an alleged uncharged crime or bad act. Although Rule 404(b) also forbids using evidence of other instances of "wrongs" to prove that an accused acted in conformity with his or her bad character trait, a mere statement that one likes pretty young girls is not a crime or a "wrong" per se. In any event, Rice never argued specifically that this statement constituted a "wrong" for purposes of Rule 404(b). Rather, it merely constituted Rice's own characterization of why he maintained a relationship with Mary and/or Cindy while he was living at the first apartment in Westerly. *See Yelland*, 676 A.2d at 1340. Accordingly, the trial justice had no obligation to provide the jury with a limiting instruction. Moreover, the trial justice did not abuse his discretion under Rule 403 (allowing the court to exclude evidence when its probative value is substantially outweighed by its prejudicial effect), when he admitted this statement. *See* R.I.R.Evid. 403. Indeed, the statement was obviously relevant to establish the defendant's lewd disposition toward, and motive for molesting, these young girls. *See Jalette*, 119 R.I. at 627, 382 A.2d at 533.

C. *The Peephole Evidence*

■■■ Rice next contends that Rule 404(b) barred admission of Mary's testimo-

ny, over his timely and specific objection, concerning his use of a peephole in the wall between the laundry room and the bathroom in the first Westerly apartment. Mary testified that on one occasion she caught Rice peering through the pencil-sized hole as she showered. The trial justice gave an immediate limiting instruction that the jury could not use her testimony on this point as evidence that Rice was guilty of crimes for which the state had charged him, but could use it only as evidence of "his disposition, motive, [or] plan." Rice asserts that this testimony was highly prejudicial and irrelevant to whether he sexually assaulted Mary. Moreover, he contends that the trial justice compounded this prejudice when he allowed the state to introduce the testimony of Rhode Island State Police Trooper Celeste Desjarlais (Desjarlais) as well as photographs of the hole that Desjarlais took. We disagree.

The testimony of Mary and Desjarlais was similar to that in *Pignolet*, in which the victim's younger sister testified about three uncharged sexual assaults upon her. *Pignolet*, 465 A.2d at 179. In *Pignolet*, we stated that such evidence of other acts of uncharged sexual misconduct toward the victim and others in her household was admissible if it was " 'interwoven with the offense for which the defendant is being tried * * *. Any circumstance that is incidental to or connected with the offense under investigation in such a way that it tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like, is proper evidence according to the overwhelming weight of authority.' " *Id.* at 180. Mary's and Desjarlais's testimony and the photographs presented to the jury depicting the peephole unquestionably were relevant to demonstrate Rice's lewd intent and lascivious designs toward this particular victim of his charged sexual misconduct. Rule 404(b) permits such evidence to be introduced, and the trial justice's careful instruction clarified for the jury its limited purposes.

Moreover, the peephole incident occurred relatively contemporaneously with the charged sexual misconduct. Previously we have upheld the admission of uncharged-sexual misconduct evidence demonstrating the accused's lewd disposition in cases in which such acts occurred on occasions far more remote in time than in this case. *See, e.g., State v. Toole*, 640 A.2d 965, 971 (R.I.1994) (upholding the admission of evidence of the defendant's " 'lustful disposition or sexual propensity' " that occurred over seven years prior to the charged misconduct). Therefore, admission of the relatively contemporaneous peephole incident was not an abuse of the trial justice's discretion.

### D. *The Washing–Machine Incident*

■ During trial, the state presented evidence to the jury, over Rice's objection, that Rice positioned Mary and Cindy to sit atop a washing machine. After he turned it on, he pressed his hands to their legs and asked them whether the machine's vibrations "felt good." The trial justice, in response to this testimony, again admonished the jury with a limiting instruction. Adverting to his limiting instruction concerning the peephole, he told the jury that the evidence about the washing-machine incident, if believed, could be used only to prove Rice's particular disposition, motive, or pattern of behavior towards these alleged victims. For reasons similar to those we adverted to in upholding the admission into evidence of the peephole incident, we also uphold the admission of this evidence.

First, the washing-machine incident implicated Rule 404(b) because it constituted evidence of an alleged previous sexual wrong or bad act. But like the peephole evidence, the washing-machine incident also demonstrated Rice's lewd disposition and sexual motive toward these young girls when they were present in his home. Therefore, Rule 404(b)'s second sentence permitted its admission in evidence.

In sum, although we have stated routinely that evidence of an accused's previous bad acts is inherently prejudicial, *see State v. Gallagher*, 654 A.2d 1206, 1211 (R.I.1995), that the prosecution ought to use such evidence sparingly, *see Jalette*, 119 R.I. at 627, 382 A.2d at 533, and that the trial justice should exclude such evidence if it is purely cumulative and inessential to the state's case, *see id.*, here, we conclude, the court did not abuse its discretion in allowing the state to present such evidence. Because each of the above-cited instances either failed to trigger Rule 404(b) at all, or else the trial justice properly admitted the evidence under one of the exceptions within that rule, their cumulative effect did not unduly prejudice the jury. Furthermore, as the trial justice stated when he denied Rice's motion for new trial, if the prosecution "was beating a dead horse with [Rule 404(b) type evidence], I know at some point I would have prevented [it] from coming in." That point, however, never came. Given the centrality of witness credibility to the charges in this case and given the prosecution's burden to prove its case against Rice beyond a reasonable doubt, we conclude that the evidence was not cumulative or inessential to the state's case.

## III

### Evidence of Rice's Alcohol Consumption

Rice next posits that the trial justice erred in permitting Mary to testify that Rice had her "sneak him some alcohol" approximately one half-hour after he assaulted her sexually in the barn, and that he then drank it there. Defense counsel objected to this proposed testimony and moved to strike Mary's evidence on this point. After the trial justice overruled defense counsel's motion, the prosecutor began to explore this incident in some detail. She elicited from Mary on direct examination that Rice took a bottle of alcohol out of a cabinet and put it somewhere in the house so Mary could sneak it out to

Rice in the garage. Rice's attorney again objected and requested a voir dire hearing on the issue, as required by our decisions in *Handy v. Geary*, 105 R.I. 419, 252 A.2d 435 (1969), and *State v. Amaral*, 109 R.I. 379, 285 A.2d 783 (1972). The trial justice, however, failed to hold the *Handy/Amaral* voir dire hearing and allowed the state to continue this line of questioning. Mary then testified that she watched Rice drink from the bottle she had smuggled out to him. After the testimony had progressed to the point at which the prosecutor asked Mary how much liquor Rice had consumed, the trial justice finally sustained Rice's objections and advised the jury immediately that "[intoxication was] not an issue" in this case. Rice argues that this instruction was insufficient to cure the undue prejudice that evidence of Rice's alcohol consumption created in the jurors' minds. Rice says that the state presented this evidence to portray him as a lecherous drunk who therefore must be guilty of the crimes charged based upon his bad character alone. Finally, Rice notes that the trial justice completely failed to follow the *Handy/Amaral* protocol when the state sought to introduce evidence of his alcohol consumption.

■ Although, for the reasons he argues, we agree with Rice that the trial justice erred when he admitted this evidence, we conclude that this error was harmless in light of the minimal impact of this evidence on Rice's culpability for the crimes in question. More than thirty years ago this Court established a procedure under which a witness's or an accused's alleged consumption of alcoholic beverages could be admitted in evidence. *See Handy*, 105 R.I. at 431, 252 A.2d at 441–42. Three years later, we applied that procedure in a criminal case to the attempted introduction of evidence concerning a witness's alleged consumption of alcoholic beverages. *See Amaral*, 109 R.I. at 387–88, 285 A.2d at 787. In *Amaral*, we held that neither party may question a witness merely to show that he or she may

have consumed some potentially intoxicating substance before an event at issue in the case has occurred. *See id.* We recognized then that "because of the undue potential of this kind of evidence to cause confusion and to be unfairly prejudicial, evidence of the drinking of alcoholic beverages should not be admitted to affect credibility." *Id.* at 386, 285 A.2d at 788. Only when it is offered for the purpose of proving "intoxication," as that term is defined in *Handy,* is such evidence admissible. *See id.,* at 386–87, 285 A.2d at 788.[9]

■ The *Handy/Amaral* procedure requires that:

"Whenever the issue of intoxication is raised, before evidence of drinking of intoxicants may be presented to the jury, the trial justice shall conduct a preliminary evidentiary hearing on this issue in the absence of the jury. If he finds that the evidence is such that different minds can naturally and fairly come to different conclusions on the question of intoxication, as we have defined that term, then and only then, may evidence of drinking be admitted under proper instructions for ultimate determination of such question by the jury under the same test." *Handy,* 105 R.I. at 431, 252 A.2d at 441–42.

Even though several of our more recent cases on this subject have not raised or mentioned the *Handy/Amaral* procedure as a prerequisite to the admissibility of whether a witness or an accused has taken intoxicating substances, *see, e.g., State v. Lemos,* 743 A.2d 558, 563 (R.I.2000) (per curiam) (noting that the admission of evidence concerning the witnesses' consumption of alcoholic beverages may have been helpful to the defendant's case without adverting to the *Handy/Amaral* doctrine);

*State v. Kelly,* 554 A.2d 632 (R.I.1989); *State v. Carrera,* 528 A.2d 331 (R.I.1987); but see *Kay v. Menard,* 754 A.2d 760, 766 (R.I. 2000) (affirming trial justice's use of *Handy* hearing before admitting evidence of intoxication), we have never abandoned the *Handy/Amaral* procedural requirement for admitting evidence concerning a witness's or an accused's possible intoxication. *Id.*

But in this case Rice's drinking or intoxication was not relevant to any of the critical issues. The state asserts that because Rice submitted evidence about the events that occurred immediately after the Hope Valley barn incident, Rice opened the door for the state to provide a complete account of those events. According to the state, it presented Mary's testimony that Rice consumed alcohol after the sexual assaults in the barn because Rice had opened the door to this evidence when he attacked Mary's credibility by establishing that her post-assault appearance was normal. If Rice was entitled to attack Mary's credibility with evidence that she appeared normal to Rice's mother immediately after the sexual assaults in the barn, the state argues, then the state was entitled to present a complete timeline of the events that occurred immediately after the sexual assault concluded, including Rice's drinking of alcohol. We disagree.

■ The trial justice should not have admitted any of Mary's testimony about her bringing alcohol to Rice at his request and then seeing Rice drink from the bottle of alcohol. This evidence was irrelevant to any of the charges against Rice and, furthermore, it occurred after the barn assaults were over. We established the *Handy/Amaral voir-dire* procedure to bar the admission of just this kind of potential-

**9.** In *Handy v. Geary,* 105 R.I. 419, 431, 252 A.2d 435, 441 (1969), we stated that

"Intoxication comprehends a situation where, by reason of drinking intoxicants an individual does not have the normal use of his [or her] physical or mental faculties,

thus rendering him [or her] incapable of acting in a manner in which an ordinarily prudent and cautious [person], in full possession of his [or her] faculties, using reasonable care, would act under like conditions."

ly damaging but ultimately irrelevant evidence, and the trial justice erred in failing to hold this hearing. Had he done so, we believe that he would have concluded that the probative value of Mary's testimony on this subject was "more than counterbalanced by its disadvantageous effects in confusing the issues before the jury, or in creating an undue prejudice in excess of its legitimate probative weight." *Handy*, 105 R.I. at 430, 252 A.2d at 441 (quoting VI Wigmore, *Evidence* § 1904).

Nevertheless, we are convinced that, in this case, the impact of this irrelevant evidence upon the jury was harmless beyond a reasonable doubt. Here, the trial justice finally halted the prosecutor's line of questioning in time to preserve Rice's right to a fair trial, thereby effectively mitigating his earlier failure to conduct the *Handy/Amaral* voir-dire procedure, especially when he then gave the jury an instruction that "[intoxication was] not an issue" in the case. Moreover, given the quantum and quality of the evidence inculpating Rice, we believe that this error was harmless beyond a reasonable doubt because of the existence of other competent evidence inculpating the defendant. *See State v. Dinagen*, 639 A.2d 1353, 1357 (R.I. 1994).

## IV

### In Camera Review of the Victim's Medical Records

During pretrial discovery, Rice filed various motions for subpoenas and for discovery of the prosecution's evidence against him. Specifically, Rice asked the state whether Mary had filed previous claims of sexual assault against others and whether she ever had recanted or qualified any of her accusations against him in this case. Rice also asked the state to provide any existing psychiatric and/or medical examination records about any treatment that physicians may have provided to Mary.

The state initially indicated that it was unaware of any previous allegations of sexual assaults that Mary may have leveled. The state also replied that it would provide any new information to the defense if it discovered any thereafter. In the state's supplemental answer to Rice's motion for exculpatory evidence, it revealed that Mary had obtained psychological counseling. The state also revealed the name of one counselor that Mary visited in September 1996, and disclosed that another counselor also met with Mary but that the state did not know that counselor's name. In response to Rice's motion in limine to bar Mary's testimony for her failure to provide the state with the second counselor's name,[10] the trial justice ordered the state to find out that counselor's name and address. Before trial, the state learned that Mary visited this same psychiatrist in New Jersey. The court then ordered the New Jersey psychiatrist to provide to the state her records concerning Mary.

On the day of trial, that psychiatrist sent to the prosecutor a facsimile of her records about Mary's treatment. The state immediately turned over these records to the trial justice. However, pursuant to the court's in-camera review of psychiatric records required by our decision in *State v. Kelly*, 554 A.2d 632 (R.I.1989), the trial justice determined that nothing contained in those records tended to negate Rice's guilt or otherwise helped his defense. Accordingly, the trial justice sealed the records and denied Rice's motion to inspect them.

At the sentencing hearing following the jury's guilty verdict, a presentence report prepared by the Department of Corrections Adult Probation and Parole mentioned that Mary had received mental

10. The state also agreed to ascertain the names of two doctors that had conducted physical examinations of Mary. During the hearing on this motion in limine, Rice also requested that the trial justice order the state to provide information about Mary's previous sexual activity, if any. The trial justice refused that request, and Rice has not challenged that ruling on appeal.

health treatment in at least three separate facilities. Moreover, the report indicated that Mary had attempted suicide by an overdose of prescription pills sometime in 1995. Defense counsel thereupon filed ·a post-trial motion to dismiss the case because the state had failed to comply with its discovery obligations in violation of Rule 16 of the Superior Court Rules of Criminal Procedure and because the state had failed to provide information tending to negate Rice's guilt, in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). In addition, defense counsel unsuccessfully made an oral motion to inspect these records before the court's ruling on his post-trial motion to dismiss the case. After hearing both arguments and inspecting the records in question, the trial justice concluded that these records contained no information that was not already known to the parties. On appeal, Rice contends that the trial justice abused his discretion when he denied his motion to dismiss the case.

Rice sought these materials in the hope that the records may have contained information that defense counsel could use to further attack Mary's credibility or to exculpate Rice. Because no other individuals witnessed any of Rice's sexual misconduct or criminal solicitations against Mary and Cindy, he argues, his entire defense revolved around being able to impeach Mary effectively. From the records that the state had provided to the defense, Mary had uttered prior inconsistent statements about exactly what happened during the barn assault. According to Rice, the version of the events Mary gave at trial was likewise inconsistent. At a minimum, Rice requests that we conduct a de novo review of the trial justice's decision that no relevant impeachment evidence existed within the records that the court sealed and barred Rice from inspecting.

In *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Furthermore, in *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972), the Supreme Court held that the government's *Brady* obligation to provide evidence to the defense encompasses evidence affecting a government witness's credibility.

 After reviewing the sealed records, we hold that the state satisfied its *Brady* obligations in this case. According to the trial justice, the state diligently provided to the defense any *Brady* information, and did so in a timely fashion. Our standard in reviewing mixed questions of law and fact like this one is to uphold a trial justice's ruling absent clear error. *State v. Lanigan*, 528 A.2d 310, 314–15 (R.I.1987). Having reviewed the sealed records, we cannot say that the trial justice's ruling on this point demonstrated clear error, and therefore we uphold the trial justice's decision not to dismiss the case.

Moreover, our review of the sealed records in this case reveals no exculpatory evidence that should have been produced to Rice under *Brady* for his use at trial. Broadly speaking, two of the sealed records contained irrelevant police-incident reports. One of the sealed records contained the medical records of the psychiatrist in New Jersey who examined Mary, and another contained the medical records from a psychiatrist in Rhode Island who also examined Mary. The last sealed record contained the presentence report that the defense did have an opportunity to inspect before sentencing because that report was not sealed until after Rice's sentencing. After careful de novo review of the psychiatrists' reports, giving due deference to Rice's right to a fair trial and to confront the witnesses against him, we are satisfied that the trial justice made the proper decision when he sealed these con-

fidential medical records without requiring their production to Rice. Mary's attempted suicide mentioned in the presentencing report and elsewhere in the sealed records was, in our opinion, irrelevant to her state of mind or to her credibility at any time pertinent to any of the events that were at issue in this trial. We also believe that it did not tend to negate Rice's guilt. *Cf. State v. Evans,* 668 A.2d 1256, 1260 (R.I. 1996) (holding that "the state's negligent disclosure denied the defendant the opportunity to present his fullest and best defense"). Moreover, nothing else contained in these sealed records warrants reversal of Rice's conviction.

## V

### Exclusion of Evidence Concerning No Physical Corroboration of Any Sexual Assault

Rice's final argument assigns error to the trial justice's refusal to allow him to introduce evidence that, when Nurse Muddiman conducted a gynecological examination of Mary at Hasbro Children's Hospital, she observed no physical signs of sexual abuse. At a hearing outside the jury's presence, the state informed the court that it wished to elicit from Muddiman, in her capacity as an expert witness, the details of her October 1995 physical examination of Mary, including that she observed no physical or clinical evidence of scarring, sexual abuse, or other injury. Indeed, her report indicated that Mary's hymen was still intact. The prosecutor stated, however, that Muddiman would also testify that the lack of any physical indication of sexual abuse did not preclude the possibility of the sexual molestation that Mary had alleged. According to Muddiman's proposed testimony, because Mary was only ten years old at the time of the barn incident, the configuration of her hymen probably had changed in the intervening four years between the alleged assault and her physical examination and, thus, the scars from any sexual penetration would have healed.

Defense counsel persuaded the trial justice to exclude Muddiman's opinion that the lack of physical findings did not rule out the possibility of sexual abuse. At the same time, however, the trial justice precluded Rice from calling Muddiman as his witness and then eliciting from her, without the accompanying explanation, that she observed no physical signs of sexual abuse during her gynecological examination of Mary. The trial justice also refused to allow Rice to argue the lack of physical signs of sexual abuse during his closing. Rice argues on appeal that this lack of any physical indication of sexual abuse is purely objective evidence that he should have been allowed to present to the jury. We disagree.

A trial justice possesses broad discretion under Rule 702 of the Rhode Island Rules of Evidence to admit or exclude expert witness testimony and under Rule 403 to exclude evidence that, if admitted, would be misleading or unduly prejudicial. Here, the trial justice noted the four-year hiatus between the barn incident and Muddiman's physical examination of Mary at Hasbro Children's Hospital, a delay that—given Mary's age and the potential for any hymen damage to heal during the intervening years—rendered the results of her examination highly unreliable. He also determined that the jury did not need the assistance of an expert to decide whether Rice, in fact, had penetrated Mary. *See* G.L.1956 § 11–37–8.1 (requiring penetration for first-degree child molestation sexual assault); R.I. R.Evid. 702. He noted that Mary had been uncertain about whether Rice had penetrated her and, if he had, the extent of that penetration. The jurors were, he ruled, capable of deciding for themselves whether Rice had sexually penetrated Mary and the extent of such penetration; furthermore, they needed no expert testimony to discern that any resulting injury may well have healed during the four-year interval. The final reason he gave to exclude Muddiman's proposed tes-

timony that she found no physical evidence of sexual abuse was that her testimony would have had the tendency to bolster Mary's credibility unfairly by lending an expert medical explanation to the absence of any physical evidence of sexual abuse. Therefore, he concluded, Muddiman's testimony was irrelevant and would not assist the jury in reaching a verdict. *See* R.I. R.Evid. 702. Having reached this decision, the court also ruled that it would be unfair to the state to allow Rice to argue the lack of physical findings to the jury without Muddiman's explanation for their absence. After the court's ruling, the defense did call Muddiman to the stand. The only pertinent testimony that Rice elicited from her was that when she interviewed Mary, Mary denied that she had engaged in oral sex with Rice.

■■■ The admission of expert testimony lies within the sound discretion of the trial justice. *See State v. Lyons,* 725 A.2d 271, 274 (R.I.1999). This Court will reverse such a ruling only for clear abuse of that discretion. *State v. LaRoche,* 683 A.2d 989, 1001 (R.I.1996). Here, we are of the opinion that the trial justice properly analyzed the effect of Muddiman's proposed testimony. We are not persuaded that he erred when he decided to exclude *both* the absence of any physical indication of sexual abuse and the proposed explanation that the lack of such findings would not be probative.[11] To admit the so-called objective lack of physical findings and exclude the witness's accompanying explanation would have had the potential to confuse and mislead the jury. Thus, the trial justice properly exercised his discretion in excluding this evidence.

11. In other jurisdictions, medical testimony concerning the absence of any physical evidence of sexual abuse cannot be introduced to indicate that no such abuse occurred, but it has been admitted as valid and objective medical evidence that the absence of physical trauma does not necessarily mean that abuse did not occur. *See People v. Wesley,* 250 Ill. App.3d 245, 190 Ill.Dec. 74, 620 N.E.2d 1335 (1993); *Commonwealth v. Federico,* 425 Mass.

### Conclusion

For these reasons we deny and dismiss Rice's appeal and affirm his convictions.

844, 683 N.E.2d 1035 (1997); *Commonwealth v. Johnson,* 456 Pa.Super. 251, 690 A.2d 274 (1997). Here, however, the trial justice believed that this evidence would have tended to bolster Mary's credibility unduly. Thus, the court may have actually assisted Rice when he excluded this evidence against the weight of authority that allows its admission for this purpose.