**STATE**

v.

**Donald F. WOODSON.**

**No. 86–262–C.A.**

Supreme Court of Rhode Island.

Dec. 23, 1988.

James E. O'Neil, Atty. Gen., Annie Goldberg, Asst. Atty. Gen., for plaintiff.

Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on appeal by the defendant, Donald F. Woodson, from his conviction in the Providence County Superior Court. Woodson was found guilty of the abominable and detestable crime against nature, fellatio, G.L.1956 (1981 Reenactment) § 11–10–1, and of second degree sexual assault, G.L. 1956 (1981 Reenactment) § 11–37–4, as amended by P.L.1984, ch. 59, § 1. He was sentenced to fifteen years imprisonment on each count: eight years to be served, seven suspended, with seven years probation to follow. We affirm.

At trial the evidence presented showed a relationship between defendant and the victim which involved drug use, forced sexual relations, and intimidation. The victim, a twenty-two year-old woman whom we shall call Crystal,[1] met Donald Woodson, a Massachusetts State Policeman, at a Christmas party in December, 1982. Crystal was an exotic dancer at a lounge in Providence and had been invited to the party by one of defendant's brothers. The guests at the party—Woodson, Crystal, Woodson's two brothers and a friend of theirs—allegedly

---

1. This is not the victim's real name.

drank mixed drinks, snorted lines of cocaine, and smoked marijuana.

The party lasted all night. In the morning, Woodson changed into his police uniform and took Crystal home to her parents' house in North Attleboro, Massachusetts. She liked Woodson. He had acted like a gentleman, and she had never met a state trooper who would "do drugs" and who wouldn't turn her in for "doing drugs."

Early in 1983 Woodson called her and asked her to go out with him; she accepted. According to testimony, he drove to a secluded parking spot where she thought they were going to share a marijuana cigarette. Instead, he threatened to drive off and leave her there, in the rain and oncoming darkness, if she refused to perform fellatio on him. Frightened and not knowing where she was, she did as she was told.

Woodson contacted Crystal again in the summer of 1983. He apologized for the events earlier that year and asked if she and a girl friend would like to accompany him and some friends to the beach. She accepted both the apology and the invitation, but tried to decline later when her girl friend backed out. She told Woodson that "four guys and one girl * * * didn't feel right;" however, he persuaded her to go, saying, "I'm a police officer. You have nothing to worry about."

At the beach, later identified as Horseneck Beach in Massachusetts, the group carried their belongings to a secluded area of dunes rather than to the main beach. The men explained that they could not bring their beer onto the beach. After the group was settled, Woodson asked Crystal to accompany him into a wooded area away from the others. She refused at first, but acquiesced when he said he just wanted to talk. Once away from the others Woodson told her that he had a fantasy about having anal intercourse. When she refused to submit, Woodson grabbed her by her hair, forced her to her knees with her face in the sand, pulled her bathing suit to her ankles, and raped her anally. When he finally

stopped, she ran back to the group's blankets in the dunes only to be held down and raped by the other three members of the group while Woodson stood by and watched. In the car on the way home the four men taunted Crystal, saying that there was nothing she could do about the attacks as no one would ever believe a dancer over a cop. At home she received a similar reaction from her father, who told her that if she pressed charges against a Massachusetts state trooper, it would jeopardize the entire family. Shortly thereafter she moved to Rhode Island.[2]

After her move Woodson followed Crystal to Rhode Island. He contacted her first at her work at a Providence lounge and then at her apartment in Glocester, Rhode Island. On Woodson's first visit to her apartment the two of them simply smoked marijuana and talked. However, on his second visit to her Rhode Island apartment, early in June 1984, the evidence shows that Woodson again forced her to perform fellatio on him after showing her that he was carrying a gun.

Woodson's final visit to the apartment in Glocester came later that month on June 25, 1984. He arrived around noon and asked the victim if she had any drugs. Woodson then told her that he was going to run her life his way by turning her out of dancing and into prostitution. When she stated that he was not going to run her life, Woodson cornered her against a wall in her bathroom and, while forcing his hand down her dress and grabbing her breast, told her that she did not have a choice in the matter, that if she did not do what he said, he would do to her again what he did at the beach. Crystal freed herself from Woodson's grasp in time to answer a phone call from a neighbor, whom she immediately summoned to her aid. She then escaped outside to the front of the apartment. Before he left, Woodson threatened that she might someday be found dead on her couch from an overdose or that she might find out just how deep the lake was behind her

2. Prior to the victim's move to Rhode Island, all alleged sexual assaults occurred in Massachusetts. We have no information about any charges brought against defendant or his accomplices in the Massachusetts courts.

house. This later statement was overheard and corroborated by Crystal's neighbor who testified at trial.

Later that same day, Crystal went to the nearby Chepachet State Police Barracks and reported the two attacks that had occurred in Rhode Island. Woodson was arrested and charged with the two crimes that had occurred in Glocester, Rhode Island: the abominable and detestable crime against nature, fellatio, for the incident in early June of 1984 and second-degree sexual assault for the attack on June 25, 1984.

Shortly after filing her complaint against Woodson, Crystal received a message that Woodson wanted to talk to her. The unidentified caller said that she "didn't have the balls" to call Woodson because she had "screwed on the case" and that she "should call him * * * and make peace with him." Crystal testified that she called Woodson several times early in 1985. During several of these calls she offered to accept money from Woodson in return for her dropping the charges in an attempt to trick him into admitting the crimes. Finally she simply told him to leave her alone as she was still being harassed and had received messages that people were going to hurt her mother.

On appeal Woodson first argues that his indictment should have been dismissed due to prosecutorial misconduct before the grand jury. During those proceedings it was revealed that Crystal had been given a polygraph test as part of the investigation of her complaint by the police. The police officer testified before the grand jury that not only was the polygraph standard departmental procedure but there was special concern in this case because the victim was an admitted narcotics user. The officer further testified that although no one can say how accurate a polygraph is, it is a useful tool, and the polygraph results, when combined with her three consistent statements and the statement of a witness, were sufficient information for the police authorities to issue an arrest warrant.

■ Woodson contends that the presentation of this evidence to the grand jury improperly influenced the grand jury's de-

cision to indict. *State v. Mainelli*, 543 A.2d 1311, 1314 (R.I.1988) (citing *The Bank of Nova Scotia v. United States*, —— U.S. ——, ——, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228, 238 (1988)). He argues that his indictment should be dismissed. We disagree.

"This court has consistently stated that the dismissal of an indictment on the grounds of prosecutorial misconduct is an extraordinary sanction reserved for very limited and extreme circumstances." *Mainelli*, 543 A.2d at 1313 (citing *State v. Chakouian*, 537 A.2d 409, 413 (R.I.1988); *State v. Wilshire*, 509 A.2d 444, 448 (R.I. 1986); *State v. Romano*, 456 A.2d 746, 750 (R.I.1983)); see also *State v. Fernandes*, 526 A.2d 495, 501 (R.I.1987); and *State v. Manocchio*, 497 A.2d 1, 12 (R.I.1985). We have also held that "notwithstanding a defendant's allegations of irregularity, an indictment returned by a legally constituted grand jury calls for a trial on the merits." *Mainelli*, 543 A.2d at 1313 (citing *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397, 402–03 (1956); *Wilshire*, 509 A.2d at 448).

*Mainelli* and its predecessors control here, but in our opinion do not support defendant. Given the circumstances surrounding the events complained of, the references made to the grand jury regarding the victim's polygraph examination are not so inflammatory or prejudicial that they call for the extreme sanction of dismissing Woodson's indictment after a trial on the merits has been held. Considered with testimony about both the questionable reliability of polygraph tests in general and the questionable credibility of the complaining witness, the officer's testimony that the victim passed the polygraph examination should not, in our opinion, unduly influence the grand jury's decision to indict. *Mainelli*, 543 A.2d at 1314 (citing *Bank of Nova Scotia*, —— U.S. at ——, 108 S.Ct. at 2374, 101 L.Ed.2d at 238).

Both this court and the United States Supreme Court have held that a conviction by a petit jury after a full trial on the merits renders harmless any defect occurring during the grand jury proceedings.

*United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 942, 89 L.Ed.2d 50, 56 (1986) (as cited by *Mainelli,* 543 A.2d at 1313; *Wilshire,* 509 A.2d at 448).

"[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Mechanik,* 475 U.S. at 70, 106 S.Ct. at 942, 89 L.Ed.2d at 56.

Woodson's conviction by a petit jury unaware of the polygraph examination makes the dismissal of the indictment wholly inappropriate.

■ Next Woodson challenges the trial justice's admission of testimony regarding "threats" received by the prosecuting witness. The first statement objected to is one made by Crystal on direct examination. We do not define this statement as "threatening." In explaining why she had called Woodson, Crystal said that she had received a message saying that she "didn't have the balls to call him because [she] had screwed on the case." Further statements alluding to threats within this same answer were stricken as nonresponsive, nevertheless; it doesn't appear to us that the statements that were admitted could be classified as threatening.

The cases relied on by Woodson are factually distinguishable from this case. In *State v. Burke,* 529 A.2d 621, 631 (R.I. 1987), a third party showed the witness a gun and said that he had been offered money to make sure that the witness did not testify. In *Stewart v. State,* 398 So.2d 369, 375 (Ala.Crim.App.1981), the defendant threatened to hurt the witness if he did not keep quiet or help the defendant cover up the crime. Four and one-half months later the witness was stabbed by an attacker who said he was doing it for the defendant. *Id.* at 375. In these cases the threats to the safety of the witnesses are clear. In the case before us, even though the language used was coarse, it neither suggested a threat of harm nor was intimidating. It was more in the nature of a dare. Thus, although the statement testified to was made by an unidentified party, it was not a threat made by or on behalf of defendant. The statement was thus admissible within the trial justice's discretion and was generally nonprejudicial.

■ The remainder of the statements objected to by Woodson were, in our opinion, admissible. Although the statements do describe threats and harassment, they all are directly attributable to discussions with Woodson himself, not some unidentified third party. Woodson's harassment of Crystal is well documented throughout her statements to the police and her testimony at trial. Furthermore, on at least one occasion Woodson's threats were corroborated by Crystal's neighbor who overheard Woodson tell her, as he left her apartment after the June 25 assault, that she might find out how deep the water was behind her house. As a result this testimony regarding harassment by defendant was relevant, material and reasonably necessary to prove Woodson's consciousness of guilt. *State v. Acquisto,* 463 A.2d 122, 128 (R.I. 1983). The admission of this testimony was within the discretion of the trial court. The statements were properly limited on defendant's objections, and when read in conjunction with testimony given by Crystal during her cross-examination by defendant, we can see no reversible error in the admission of these statements.

■ Woodson's next issue concerns the admission of testimony regarding his alleged use of drugs. The defendant argues that the admission of such testimony was prejudicial and without probative value. We disagree. Evidence of a defendant's drug or alcohol use may be inadmissible if it tends to confuse jurors by introducing additional issues not necessary in deciding the questions before them. *State v. Amaral,* 109 R.I. 379, 386, 285 A.2d 783, 787 (1972). In this case; however, the drug use was so intertwined with the facts that it became part and parcel of the entire case.

This case is distinguishable from both *State v. DiPrete*, 468 A.2d 262 (R.I.1983), and *State v. Burke*, 427 A.2d 1302 (R.I. 1981), two cases relied on by Woodson. In *DiPrete* this court found evidence of the defendant's connection to a drug rehabilitation center inadmissible as it had no connection to his robbery of a convenience store. *DiPrete*, 468 A.2d at 265–66. In *Burke* the defendant's possession of marijuana was held inadmissible when it was determined that he was driving under the influence of alcohol, not marijuana. *Burke*, 427 A.2d at 1304. The drug-related evidence in each of these cases had no factual connection to the crimes charged and thus had no probative value regarding any issue necessary in proving the commission of the crimes.

In this case it is clear from the testimony of both parties that drugs played a role in their relationship. Therefore, evidence of drug use is relevant and material in determining the nature of their relationship, as well as their credibility as witnesses. In situations where the sharing and use of drugs by both a defendant and his victim together are very much a part of the setting in which the charged assaults occurred, allowing evidence of drug use by one party and not the other would give the jury an incomplete and false portrayal of the events in question.

■ Woodson's next issue on appeal concerns the alleged failure of the prosecution to properly disclose evidence pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure. Woodson correctly asserts that the state has an affirmative duty to comply with Rule 16 and that he as a defendant should be able to rely on honest and complete answers to discovery furnished in response to Rule 16. *State v. Heredia*, 493 A.2d 831, 833 (R.I.1985); *State v. Concannon*, 457 A.2d 1350, 1353 (R.I.1983); *State v. Diaz*, 456 A.2d 256, 258 (R.I.1983); *State v. Coelho*, 454 A.2d 241, 244 (R.I.1982).

Rule 16(a) requires the state to supply upon request by a defendant:

"(6) a written list of the names and addresses of all persons whom the attorney for the State expects to call as witnesses at the trial in support of the State's direct case;

(7) as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial[.]"

Woodson complains that owing to the prosecution's failure to comply with Rule 16(a)(6) and (7) he was surprised by both Crystal's testimony about threats she allegedly received and the testimony of a police witness regarding certain telephone calls Crystal made to Woodson in an attempt to trick him into admitting the crimes.

As stated earlier, Crystal's statements to the police contained allegations of threats and harassment by Woodson and others. Woodson was furnished copies of these statements. Woodson was also alerted by a supplementary response to discovery that an officer would be testifying as to Crystal's intent in making those calls to Woodson. This supplementary response provided the officer's name and a summary of his intended testimony as required by Rule 16. Woodson already possessed tape recordings and transcripts of the calls.

■ Contrary to Woodson's assertion Rules 16(a)(6) and (7) do not obligate the state to provide a defendant with a detailed narration of the testimony of its witnesses. Rule 16(a)(7) simply requires the state to provide a defendant with all the relevant, recorded data on which the testimony of its witnesses will be based. Only when the state does not possess such information, is it required to supply the defense with a summary of a witness's expected testimony.

■ The state met all the requirements of Rules 16(a)(6) and (7). It provided the defense with a complete list of witnesses accompanied by all the relevant information necessary for the defense to prepare

for the testimony of those witnesses. This is all that is required. At the time of the second trial[3] the defense had received, or was already in possession of, all the information it now claims should have been excluded. There is no merit in the claim that the defense was not provided with the specific testimony of the prosecution's witnesses. All the information they were entitled to was in their possession.

■ Woodson's final concern is the admission of testimony about the sexual assaults committed by Woodson and his companions at Horseneck Beach. Woodson argues that testimony concerning this alleged occurrence is barred by the general rule that past, unconnected, uncharged criminal behavior is not admissible to show a propensity to commit the crime charged. See *State v. Pignolet,* 465 A.2d 176, 179 (R.I. 1983); *State v. Jalette,* 119 R.I. 614, 624, 382 A.2d 526, 531 (1978); *State v. Colangelo,* 55 R.I. 170, 173, 179 A. 147, 149 (1935). That, of course, is the general rule.

■ However, this court has recognized certain exceptions. Evidence of other conduct, even of a criminal nature, may be received if it is interwoven with the current charge in a way that tends to establish "guilty knowledge, intent, motive, design, plan, scheme, system, or the like." *State v. Beaulieu,* 116 R.I. 575, 579, 359 A.2d 689, 691 (1976) (citing *Colangelo,* 55 R.I. at 174, 179 A. at 149). In the case of sexual assault, this list of exceptions was also expanded to allow evidence of past conduct to show the defendant's lewd disposition or intent toward the prosecuting witness. *State v. Bernier,* 491 A.2d 1000, 1004 (R.I. 1985) (citing *Jalette,* 119 R.I. at 627, 382 A.2d at 533). Indeed, except when used purely to show a criminal predisposition, relevant evidence should not be excluded simply because it reveals the commission of an offense other than the one charged. *People v. Kelley,* 66 Cal.2d 232, 424 P.2d 947, 57 Cal.Rptr. 363 (1967) (as adopted by *Jalette,* 119 R.I. at 627, 382 A.2d at 533).

■ According to the testimony in question, Woodson convinced Crystal to accompany him and three other males to the beach by telling her that she had nothing to fear because he was a police officer. However, once at the beach he raped her anally and then looked on while the three other members of the group raped her in turn. Later, during the ride home, her attackers taunted her saying that there was nothing she could do about what had happened because no one would ever believe the word of an exotic dancer over that of a police officer.

This evidence is within the exceptions set out by both *Colangelo* and *Jalette.* The testimony is reasonably necessary in order for the prosecution to establish Woodson's lewd disposition or intent. *Bernier,* 491 A.2d at 1004 (citing *Jalette,* 119 R.I. at 627, 382 A.2d at 533). Her testimony directly supports the prosecution's assertion that Woodson knew her and believed her to be powerless against his sexual advances. Also, the testimony tends to establish a "design, plan, [or] scheme," *Colangelo,* 55 R.I. at 174, 179 A. at 149, on the part of defendant to force the victim to service him sexually while convincing her that his credibility and status as a Massachusetts state trooper would protect him from any form of retribution she might attempt.

■ We also point out, as noted in *Pignolet,* that when *Jalette* adopted *Kelley,* the standard for admission of this type of evidence was changed from a showing of absolute necessity to one of reasonable necessity. *Pignolet,* 465 A.2d at 180. Thus, while evidence of past sexual conduct will not be admissible if it is merely cumulative or unrelated, it will be admissible if reasonably necessary to establish some material aspect of the prosecution's case.

The use of such "other crimes" evidence has the potential to prejudice an otherwise fair trial. Here adequate safety measures were taken to protect defendant. Prior to trial, the admissibility of this testimony was thoroughly explored by the court on the state's motion in limine. During the trial, the testimony in question was adequately limited by the trial justice to reduce, as far as possible, any unwarranted

---

**3.** Woodson's first trial ended in a mistrial.

prejudicial effect. The jury was admonished twice, once during the testimony of the prosecuting witness and again during the final instructions to the jury in regard to the limited use for which this testimony could be employed.

In upholding the trial justice's admission of this testimony, we reiterate our admonition in *Jalette* that the trial courts be vigilant in the exercise of their expertise, ingenuity and sound judgment to strike a proper balance between the prosecutor's right to present necessary, relevant, and material evidence and the accused's right to an impartial jury, untainted by prejudice arising from improper evidence. *Jalette*, 119 R.I. at 628, 382 A.2d at 534.

For the foregoing reasons the defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the papers of the case are remanded to the Superior Court.