**Supreme Court**

No. 2009-173-C.A.
(K1/08-87A)

State                              :

    v.                              :

Alfred Bishop.                     :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| v. | : |
| Alfred Bishop. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** Before this Court is an appeal from a judgment of conviction adjudicating the defendant Alfred Bishop guilty of (1) first-degree murder, pursuant to G.L. 1956 § 11-23-1; (2) burglary, pursuant to G.L. 1956 § 11-8-1; (3) three counts of using a firearm while committing a crime of violence, pursuant to G.L. 1956 § 11-47-3.2; and (4) two counts of assault with a dangerous weapon, pursuant to G.L. 1956 § 11-5-2. In May 2009, he was sentenced to life without parole on the murder conviction, and he was sentenced to significant further incarceration on the other counts. Bishop filed a motion for new trial, but the motion was denied by the trial justice. Bishop now appeals from the judgment of conviction, arguing that the trial justice erred in refusing to admit evidence about the alleged intoxication and drug possession of certain witnesses for the state and in allowing what he contends was extremely prejudicial information about Bishop's parole status into evidence. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

### A

### Background

#### 1

#### Underlying Home Invasion

The dramatic and ultimately fatal series of events giving rise to the charges against Bishop began to unfold on June 27, 2007. Ceasar and Claire Medeiros, husband and wife, lived in Warwick with Ceasar's brother, Gabriel, and a pet dog.[1] On the night of June 27, 2007, at around midnight, Ceasar and Claire were awakened by the sound of their dog barking. Ceasar said he got out of bed to investigate, while Claire remained in bed. He went out to the darkened hallway and saw a masked figure holding a shiny object in his hand. Ceasar pleaded with the intruder to not hurt his family and told the intruder that there was money and jewelry in the bedroom. Ceasar returned to the bedroom, and, when he noticed that the intruder had not followed him, he grabbed a golf club and went back to the hallway, where he proceeded to clobber the intruder with a blow to the head—a blow so strong that the head of the golf club separated from the shaft. Ceasar continued to strike the intruder with the shaft of the golf club, and he also began to kick him. During the ensuing fierce struggle, a firearm discharged.

Claire testified that she came out of the bedroom and turned on the hallway light for a few seconds so that she could see what was going on. By this time, and as a result of the confrontation with Ceasar, the intruder's ski mask had become partially dislodged. Both Claire and Ceasar later testified that they were able to view the intruder's face. Claire turned off the

---

[1] Throughout this decision, we refer to some individuals by their first name. This is for the purpose of clarity only, and we intend no disrespect.

hallway light, ran to a spare bedroom to get a phone, went back to her bedroom, and called the 9-1-1 emergency system for help.

According to Ceasar, the intruder then retreated into the kitchen, which, by this time, had been illuminated by Gabriel, who had arrived from his basement bedroom to investigate the disturbance. Ceasar followed the intruder and observed Gabriel and the intruder engage in a deadly struggle. There was a shot, after which Gabriel and the intruder both fell to the kitchen floor, and then there was another shot. Ceasar began to use the end of the golf club shaft to stab the intruder but fell down during the scuffle. The intruder was able to break away, escaping through a sliding glass door in the dining area and disappearing into the night. Before the intruder fled, Ceasar was able to look at the intruder's face once again, because, by this time, the ski mask had been completely removed. Ceasar next remembered his wife coming into the kitchen and emergency personnel arriving on the scene.

Ceasar, Claire, and Gabriel were rushed to the emergency room at Rhode Island Hospital. Claire had incurred a minor gunshot wound in her upper leg, and Ceasar had suffered one gunshot wound to his arm and another to his leg. Gabriel, however, was pronounced dead as a result of a gunshot wound to the torso shortly after he was brought to Rhode Island Hospital.

When Claire and Ceasar arrived at the emergency room, they were met by police officers who attempted to obtain descriptions of the intruder from them. Claire described the intruder as a white male with slicked-back, gray hair, who looked over the age of forty. She also described him as four inches taller than her husband, who was about five-feet and seven-inches tall. She believed that the man was wearing a black hooded sweatshirt. Ceasar's description was similar—he said that the intruder was a man with "wrinkles," "beady eyes," a receding hairline, and "slicked back hair" that was either red in color or possibly gray in color with blood matted

into it. A laboratory report from the hospital, which was later admitted into evidence, indicated that Ceasar's blood alcohol content was 0.134 shortly after he was first seen at the emergency room.

Shortly thereafter, a retired Warwick Police Captain Linda I. Eastman, who was a sketch artist, created a composite sketch based on Claire's description of the intruder. The sketch was then shown to Ceasar, who suggested that the intruder had more of a receding hairline than was depicted in the first sketch; Claire agreed. The composite sketch was then distributed within the Rhode Island law-enforcement community, resulting in a tentative identification of Bishop as the intruder.

Warwick Police Det. Sgt. Robert Bentsen, who was the lead investigator in the case, was advised that the sketch resembled Bishop. On July 1, 2007, Det. Sgt. Bentsen attempted to visit Bishop at his last known address, and when nobody answered the door, Det. Sgt. Bentsen visited another location where he believed Bishop might be visiting—the home of Bishop's sister and her husband—to no avail. However, Bishop's brother-in-law called another location where he believed Bishop was living and left a message for Bishop to call Det. Sgt. Bentsen. Later that afternoon, Bishop returned Det. Sgt. Bentsen's telephone call. In that conversation, Bishop indicated that he wanted to talk about the June 27, 2007 incident, but said that he could not because he had sustained some minor injuries over his left eye—explaining that he had hurt himself at his place of employment. The telephone call ended before any arrangement could be made for the detective to interview Bishop. On July 2, 2007, Det. Sgt. Bentsen then contacted Bishop's parole officer, Matthew Degnan, who informed him that Bishop had failed to report to him that day, as required by the conditions of his parole. Degnan indicated that he obtained a parole-detention warrant for Bishop because he had failed to attend the scheduled meeting—a

violation of his parole—and also because he had tested positive for alcohol at an earlier meeting—yet another parole violation.

In addition, Warwick Police Det. Barbara Frazier, who worked in the Bureau of Criminal Identification, obtained a warrant authorizing the search of the home of Reine Bishop, Bishop's ex-wife. Parole logs, in which Bishop was required to memorialize everywhere he went and the persons with whom he was with, were seized from a dresser located in Reine's bedroom. One of those logs, dated June 27, 2007, reflected the notation: "stayed overnight at Reine's mothers." However, another parole log for the same day indicated that Bishop had left Reine's home shortly before midnight. No satisfactory explanation for that discrepancy ever was offered.

Eventually, by tracing a telephone call, Det. Sgt. Bentsen was able to locate Bishop. On July 3, 2007, Bishop was taken into custody without incident. At police headquarters, Bishop's photograph was taken, and hair samples and DNA samples were obtained.

That same afternoon, Ceasar and Claire were asked to report to police headquarters for additional questioning; they were not told specifically what the questions would involve. In fact, Det. Frazier had compiled a photo array. The photo array was shown to Claire and Ceasar, independently of each other, and both identified Bishop as the intruder.[2]

**2**

**Forensic Evidence Development**

After the crime scene was secured, detectives began to develop forensic evidence. Physical evidence—including the ski mask, several bullet casings, a seat cover of a chair from the deck, and the shaft and head of the golf club—was retrieved from the scene, and numerous photographs were taken. Blood samples were also collected from some of the physical evidence,

---

[2] Before trial, the trial justice determined that the method employed by the police for this identification procedure was proper. Bishop does not challenge that ruling on appeal.

as well as from a number of areas within and around the home, including the hallway, kitchen, dining area, and the sliding glass door. The samples were submitted to the Rhode Island Department of Health for DNA analysis, where it was determined that certain samples that were tested—the ski mask, the kitchen and dining room, the seat cover, a portion of one of the venetian blinds, and the golf club head—matched Bishop's DNA. Further, a forensic examination was conducted on hair that was found inside the ski mask. This also matched a hair sample retrieved from Bishop when he was taken into custody.

In addition, although there was no evidence of a forced entry at the Medeiroses' home, the photographs from the kitchen portrayed a violent struggle, as emphasized by large quantities of blood on the floor, the walls, and the venetian blinds. There was also a trail of blood leading from the sliding glass door that was near the dining area, which allowed the detectives to track the route of the intruder's escape. Indeed, the blood trail indicated that the intruder exited the house onto the deck, cut through the backyard, passed some foliage and a fence on the side of the house, and then traveled across the street into a parking lot of a school administration building. That parking lot was near Reine's home.

**B**

**Pretrial Motions**

On February 6, 2008, an indictment was returned against Bishop. Before the trial commenced, the state had filed various motions in limine, three of which underlie the issues now before us on appeal. One of the motions filed by the state was "to prohibit evidence of the presence of alcohol or controlled substances in the blood of [Ceasar, Claire, and Gabriel]," and

another was "to prohibit evidence of the fact that marijuana and Inositol[3] were found in the bedroom of Gabriel." The trial justice did not formally rule on these motions after they were argued. However, evidence of Ceasar's alcohol consumption was later admitted at trial, but evidence of Ceasar, Claire, or Gabriel's alleged use or possession of controlled substances was excluded. Indeed, during the trial, when defense counsel attempted to cross-examine Ceasar and Claire about their alleged drug use on the evening in question, the trial justice sustained the state's objection, ruling that defense counsel had failed to proffer any evidence that the use of drugs had affected the memory or conduct of the witnesses. Similarly, when defense counsel sought to cross-examine Warwick Police Det. Daniel Gillis of the Bureau of Criminal Identification about the marijuana and cutting agent found in Gabriel's bedroom, the trial justice sustained the state's objection to the admission of such evidence because defense counsel had not established its probative value.

The other relevant motion was the state's motion to allow the introduction of the following evidence:

> "1. That [d]efendant was incarcerated at the [Adult Correctional Institutions (ACI)] before August, 2006;
> "2. That [d]efendant had been on parole since August, 2006 and remained on parole until July 3, 2007;
> "3. That [d]efendant had a parole officer from August, 2006 through July 3, 2007 * * * whom he reported to;
> "4. That [d]efendant failed to appear for a required meeting with his parole officer on July 2, 2007;
> "5. That [d]efendant, as a condition of parole, maintained a log of his daily travels;
> "6. That a [w]arrant for a [v]iolation of his parole was issued on July 2, 2007 and executed on July 3, 2007."

---

[3] Inositol is a common "cutting agent," which is a substance used to increase the volume of a quantity of a controlled substance.

Conversely, defense counsel filed a motion in limine to prohibit direct or indirect references by the state and its witnesses to various evidence, including, as relevant to this appeal, "[a]ny testimony of the prior record of the defendant," "[a]ny testimony or reference to defendant's parole status," and "[a]ny testimony or reference to defendant's parole 'log,' or introduction of said log." When he ruled on these motions, the trial justice excluded any reference to Bishop's incarceration, but he did allow limited evidence concerning Bishop's parole status at the time of the incident in question. The trial justice based his decision on a finding that "under the circumstances * * * the parole status of [Bishop] d[id] not substantially outweigh its probative value due to the fact that it is something that's intertwined through the testimony of a number of witnesses and * * * [Bishop]'s statement [to the police] on July 3."

After the hearing on the motions in limine, a trial before a jury commenced, beginning on February 23, 2009 and ending on March 4, 2009. During the trial, testimony was presented from twenty-one witnesses for the state, including Ceasar and Claire, who testified about the home invasion that occurred on June 27, 2007, and many of the police detectives involved in the investigation and development of the evidence against Bishop. In addition, Kenneth Turchetta, an acquaintance of Bishop's, testified that he received telephone calls from Reine early on the morning of June 28, 2007. He said that he recognized Bishop's voice in the background, and he remembered Reine saying that they needed a doctor. Similarly, Daniel Antonelli, who had employed Bishop as a woodworker for about six months starting in August 2006, recalled that Bishop stopped by on June 28, 2007 and asked Antonelli to provide him with a false alibi—that Bishop had been injured while working at Antonelli's shop and that the injury was caused by some pipe staging. Antonelli initially agreed to go along with the alibi suggestion, but within a day or two, he changed his mind and informed Bishop that he would not lie on Bishop's behalf.

Finally, Bishop took the stand and offered a version of the facts that was strikingly different from the description that had been provided by Ceasar and Claire. Bishop did not deny that he was inside the home of Ceasar and Claire on the night in question. However, he explained that he had been at Reine's house, and, at some point during the night, he saw a shadow pass by the bedroom window. He said he went outside to investigate, but he did not discover any intruder. He claimed that he sat on the front stairs, at which point he heard someone call out his name. He realized that the person who was calling his name was in front of Ceasar and Claire's driveway. Bishop walked towards the person, who said, "my brother wants to talk to you," and led Bishop inside the home. Bishop testified that he entered the house, and the door was immediately shut behind him. According to his testimony, he immediately found himself surrounded by three men. One of the men put a gun to Bishop's ear, while another placed a ski mask over his head and remarked, "he's looking like a burglar now." The third man retrieved a golf club and began to strike Bishop with it. Bishop said a gun went off before the first blow from the golf club, but that he was not wounded. The men moved Bishop to the kitchen, where more shots were fired, and Bishop found himself on the floor, struggling with the man who possessed the gun.

Bishop explained that he attempted to escape through a sliding glass door, but on an adjacent deck, he saw the man with the gun. The man attempted to shoot him, but the gun merely clicked and the man ran off across the yard. Bishop tried to follow him, but he heard police sirens and retreated, first across the street next to Reine's house and then to a friend's house. He claimed that he bandaged his head and called Reine to pick him up.

The jury found Bishop guilty as to all counts submitted to it.[4] Bishop filed a motion for a new trial, which was denied on April 28, 2009. He was subsequently sentenced to life imprisonment without the possibility of parole, two additional life sentences—one to run consecutive to the first and the other to run concurrent—and four consecutive twenty-year sentences. Bishop filed a timely notice of appeal on May 22, 2009, challenging the trial justice's decision to exclude any evidence of drug use by Ceasar or Claire, to exclude any evidence of drug possession by Gabriel, and to admit evidence of Bishop's parole status.

## II

### Standard of Review

We have long held, and in this jurisdiction it is beyond peradventure, that "decisions concerning the admissibility of evidence are 'within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" State v. Gaspar, 982 A.2d 140, 147 (R.I. 2009) (quoting State v. Mohapatra, 880 A.2d 802, 805 (R.I. 2005)). Likewise, this Court reviews a trial justice's decision to limit the scope of cross-examination for an abuse of discretion. State v. Clark, 974 A.2d 558, 583 (R.I. 2009).

Similarly, "[t]he admission or exclusion of evidence 'under Rule 403 [of the Rhode Island Rules of Evidence] is within the sound discretion of the trial justice.'" State v. Shelton, 990 A.2d 191, 202 (R.I. 2010) (quoting Blue Coast, Inc. v. Suarez Corp. Industries, 870 A.2d 997, 1007 (R.I. 2005)). However, "the discretion to exclude evidence under Rule 403 must be exercised sparingly." Id. (quoting State v. Hak, 963 A.2d 921, 928 (R.I. 2009)). "Under Rule

---

[4] The indictment in this case charged Bishop with first-degree murder, burglary, three counts of discharging a firearm during the commission of a violent crime, two counts of assault with a dangerous weapon, and two counts of felony assault. However, the state dismissed the two counts of assault with a dangerous weapon.

403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." Id. (quoting Hak, 963 A.2d at 928). "This [C]ourt will not reverse the trial justice's determination unless it constitutes a clear abuse of discretion." Id. (quoting State v. Tempest, 651 A.2d 1198, 1216 (R.I. 1995)).

## III

## Analysis

## A

## Consumption of Intoxicants

Bishop argues that the trial justice abused his discretion when he disallowed evidence that Ceasar, Claire, and Gabriel had either taken or possessed drugs on the evening of the incident and, thus, violated his constitutional right to cross-examination. Bishop maintains that there was evidence of "heavy alcohol and drug use by those living in the home" and that that supports a finding of intoxication.

It is well recognized that proof that a witness consumed intoxicating substances at or around the time of the event that he or she is testifying about is relevant to impeach a witness's ability to perceive an event, to remember the facts, and to accurately relate those facts at trial. See Avarista v. Aloisio, 672 A.2d 887, 891 (R.I. 1996) (explaining that evidence of intoxication is permissible "to test the witnesses' accuracy, memory, veracity, or credibility" citing State v. Crowhurst, 470 A.2d 1138, 1143 (R.I. 1984)); O'Brien v. Waterman, 91 R.I. 374, 381, 163 A.2d 31, 35 (1960). This alone, however, is not enough. Contrary to Bishop's argument—that evidence of the influence of drugs is never excludable on relevance grounds because credibility is always relevant—the admissibility of evidence regarding consumption of intoxicating substances is not completely unfettered: "neither party may question a witness merely to show

- 11 -

that he or she may have consumed some potentially intoxicating substance before an event at issue in the case has occurred" in an attempt to affect credibility. State v. Rice, 755 A.2d 137, 148-49 (R.I. 2000) (citing State v. Amaral, 109 R.I. 379, 386, 285 A.2d 783, 787 (1972)).

Bishop improperly conflates the holding that evidence of intoxication is "never excludable on relevance grounds" with the proposition that such evidence is always admissible. State v. Squillante, 622 A.2d 474, 481 (R.I. 1993). This is an incorrect reading of the rules of evidence and does not comport with our longstanding interpretation thereof. Indeed, under Rule 403, relevant evidence can be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It is because of the undue potential to cause confusion and unfair prejudice in admitting evidence of intoxication that we established a "gatekeeping procedure" in Handy v. Geary, 105 R.I. 419, 431, 252 A.2d 435, 441 (1969), to determine whether evidence of this kind is admissible for the purpose of attacking the credibility of a witness. Clark, 974 A.2d at 582-83 (citing Handy, 105 R.I. at 431, 252 A.2d at 441-42); Avarista, 672 A.2d at 891. Indeed, "[o]nly when [evidence of the consumption of intoxicants] is offered for the purpose of proving 'intoxication,' as that term is defined in Handy,[5] is such evidence admissible." Rice, 755 A.2d at 149.

Specifically, under the Handy procedure, before evidence of the consumption of intoxicants may be introduced into evidence, "the trial justice shall conduct a preliminary

---

[5] In Handy v. Geary, 105 R.I. 419, 431, 252 A.2d 435, 441 (1969), this Court defined "intoxication" as

> "a situation where, by reason of drinking intoxicants an individual does not have the normal use of his physical or mental faculties, thus rendering him incapable of acting in a manner in which an ordinarily prudent and cautious man, in full possession of his faculties, using reasonable care, would act under like conditions."

- 12 -

evidentiary hearing on th[e] issue in the absence of the jury" to resolve whether evidence of consumption rises to such a level that it should be admitted at trial. Handy, 105 R.I. at 431, 252 A.2d at 441-42; see Clark, 974 A.2d at 583. Only if the trial justice finds "that the evidence is such that different minds can naturally and fairly come to different conclusions on the question of intoxication, * * * then and only then, may evidence of [consumption of intoxicants] be admitted under proper instruction" given to the jury. Handy, 105 R.I. at 431, 252 A.2d at 442. Accordingly, as a predicate to the admission of evidence of intoxication, the trial justice must be satisfied that the evidence is sufficient to allow a reasonable juror to conclude that the witness was, in fact, intoxicated.

In Amaral, 109 R.I. at 387, 285 A.2d at 787-88, we extended the application of the Handy procedure to criminal cases. See also State v. McRae, 31 A.3d 785, 790 (R.I. 2011); State v. Mattatall, 114 R.I. 568, 572, 337 A.2d 229, 232 (1975). We have also applied this test equally to admitting evidence of drug use and other intoxicants. See State v. Ahmadjian, 438 A.2d 1070, 1088 (R.I. 1981) (applying Handy to marijuana); Mattatall, 114 R.I. at 572, 337 A.2d at 232 (applying Handy to narcotics, as well as alcohol).[6]

With regard to Ceasar, Bishop argues that there was ample evidence of Ceasar's drug use, which, he argues, was critical to the jury's assessment of whether Ceasar had accurately perceived and could accurately recount the events of June 27, 2007. Specifically, Bishop points to the laboratory report that indicated traces of cocaine and marijuana in Ceasar's bloodstream

---

[6] We recognize that some cases from this Court have not raised or mentioned the Handy procedure as the prerequisite in evaluating the admissibility of intoxicating substances for the purpose of impeachment, see, e.g., State v. Lemos, 743 A.2d 558, 563 (R.I. 2000); State v. Squillante, 622 A.2d 474, 481 (R.I. 1993); State v. Kelly, 554 A.2d 632, 637 (R.I. 1989); State v. Carrera, 528 A.2d 331, 333 (R.I. 1987); however, we clarified in State v. Rice, 755 A.2d 137, 149 (R.I. 2000), and reaffirmed in State v. Clark, 974 A.2d 558, 583 n.24 (R.I. 2009), that Handy and its progeny establish the procedure for determining the admissibility of this evidence.

- 13 -

and a blood alcohol content of 0.134, Ceasar's testimony that he consumed four cocktails, his imperfect description of the intruder to the police, and his statement to a detective that "everyone drank and smoked marijuana" on the night of the incident. However, based on our review of the record, we are satisfied that the trial justice did not err in limiting the cross-examination about Ceasar's alleged drug use.

Indeed, before limiting the evidence of Ceasar's drug use, the trial justice carefully reviewed the challenged evidence. See Clark, 974 A.2d at 564 (emphasizing that a trial justice should "cautiously exercise his or her discretion, ever mindful of the potential for prejudicial error," when the state seeks to limit or exclude evidence in a criminal case). When he considered the evidence of Ceasar's drug use, the trial justice determined that defense counsel had not come forward with any evidence about whether the trace amount of cocaine or any other illicit substance that was found in Ceasar's blood would have affected his memory, conduct, or ability to perceive the events that were occurring on the night in question. Id. 582-83 (Handy standard not met when an individual had been drinking but no proof was presented as to a lack of physical and mental faculties). Although defense counsel emphasizes the laboratory report, which indicated trace amounts of cocaine, opiates, and cannabinoids in Ceasar's system,[7] the trial justice concluded that there was nothing of evidentiary value that would quantify the amount of

---

[7] The report indicated "POS NC*," or "positive not confirmed," as to the presence of opiates, cocaine, and cannabinoids. The asterisk is keyed on the report to mean "Critical/Abnormal" and "Abnormal." Further, a footnote was provided next to opiates, supplementing that

> "[a]ll drug of abuse * * * immunoassays are performed on urine samples unless otherwise noted. Results are from screening methods. * * * Positive results of screening tests are not confirmed and are reported as 'POS NC' (positive not confirmed). Confirmed drugs of abuse are reported as positive. If confirmatory testing is desired, it MUST BE REQUESTED as a separate order to the Toxicology Lab WITHIN 5 DAYS OF SAMPLE COLLECTION. Unconfirmed screening result should only be used for medical purposes."

cocaine that may have been in Ceasar's system at the time of the incident, nothing to show how long the drug may have been in his system, and nothing of evidentiary value to demonstrate that any cocaine in Ceasar's system was sufficient to affect his ability to perceive the events. Indeed, the trial justice noted that defense counsel

> "advised the [c]ourt * * * that he d[id] not have an expert to testify whether or not the amount of cocaine [wa]s significant, whether it would affect Ceasar Medeiros's memory or his conduct on the evening in question, nor [wa]s there a proffer as to what the expert would testify to concerning the issue of how long cocaine and its various forms might stay in the human body * * *."

Based on this lack of proof, the trial justice held that the evidence contained in the laboratory report did not rise to the level where different minds could come to different conclusions as to whether Ceasar was intoxicated, and, therefore, he excluded the evidence of Ceasar's drug use. See Handy, 105 R.I. at 431, 252 A.2d at 441-42. "This Court will not disturb a trial justice's decision to limit the scope of cross-examination absent an abuse of discretion," and we perceive the existence of no such abuse here. Clark, 974 A.2d at 583. Accordingly, we hold that there was no error in the trial justice's decision to exclude evidence of Ceasar's use of drugs.

Even less evidence was presented by Bishop with regard to Claire and Gabriel's alleged intoxication. The evidence Bishop's trial counsel was prepared to offer about Claire was a statement made by Ceasar to Det. DiGregorio that "everyone drank and smoked marijuana" on the night of the incident. Defense counsel argued to the trial justice that smoking marijuana was relevant to "set[] the tone of what was going on in the house before the defendant supposedly entered, and * * * [to explain] what state of mind [Ceasar, Claire, and Gabriel] were in before the defendant came in." However, the trial justice quite correctly found that this offer of proof was insufficient under Handy, Amaral, and Rice, because defense counsel had not come forward with

any evidence "that either the ingestion of illicit drugs, marijuana, or alcohol arose to the level of intoxication."

In a similar vein, defense counsel argued that the existence of marijuana and a cutting agent found in Gabriel's bedroom should be presented as "part of the climate of what was going on in th[e] house." The trial justice sustained the state's objection to this line of inquiry because defense counsel failed to establish the probative value of this evidence. We agree with the trial justice and, accordingly, hold that the trial justice did not abuse his discretion in limiting the cross-examination of Ceasar, Claire, and Gabriel's alleged drug use and possession.

We pause to note that, in our opinion, the trial justice was more than fair when he allowed testimony about Ceasar's alcohol intake. The jury was well aware of Ceasar's potential credibility issues with regard to his capacity to recount the events at issue, which had been significantly called into question by his own testimony that he had consumed "a couple of cocktails" when he went out to lunch with his sister-in-law on June 27, 2007. Further, when pressed on cross-examination, he stated that he actually imbibed somewhere around four cocktails at lunch and drank still more when friends stopped by the house earlier that evening. In addition, before it retired to deliberate, the jury was provided with a copy of the hospital laboratory report. Although the references to any illegal substances had been redacted, the report nonetheless indicated that Ceasar's blood alcohol content was 0.134. Accordingly, because the trial justice did not abuse his discretion when he found that the evidence of drug use and possession was inadmissible under Handy and its progeny, and given the fact that defense counsel was provided with a reasonable opportunity to impeach Ceasar about his alcohol usage,

we hold that the trial justice did not violate Bishop's confrontation rights by limiting defense counsel's cross-examination with respect to the use of or possession of any drugs.[8]

Bishop claims, however, that the trial justice erred by requiring expert testimony to prove that consumption reached a level of intoxication. This, he argues, was an error of law because there is no obligation, as a condition precedent to admitting intoxication evidence, for the production of an expert to prove the effect of the substance. We disagree with Bishop's characterization that the trial justice obligated them to produce expert testimony.[9]

A close look at the record reveals that the trial justice did not limit the cross-examination because he believed that, as a matter of law, Bishop needed an expert to testify to the intoxicating effects of ingesting cocaine and other illicit substances. Even though he noted that there was an absence of expert testimony, the trial justice was simply considering the evidence before him in deciding whether Bishop had produced the quantum of evidence sufficient to allow evidence of intoxication to come before the jury—a fact-intensive analysis. Indeed, the veteran trial justice concluded that the inference suggested by Bishop—that, based on the presence of cocaine in Ceasar's bloodstream, the jury could infer that Ceasar was intoxicated—was far too conjectural and speculative to meet the Handy standard. See Ahmadjian, 438 A.2d at 1088 (cross-examination properly limited when the defendant failed to offer an evidentiary basis for

---

[8] Similarly, Bishop argues that evidence of Ceasar's drug use would have been relevant to support the defense's theory that Bishop had been coaxed into the house by several men, including Ceasar, because evidence of drug use would have made it more likely that Ceasar was disinhibited and in a state to engage in aggressive behavior. However, in accordance with our discussion above, the trial justice properly excluded evidence of Ceasar's use of drugs because defense counsel failed to offer evidence of intoxication.

[9] We note that both parties have cited a number of cases from other jurisdictions to advocate for their respective positions as to whether expert testimony should be required before allowing evidence of the consumption of intoxicating substances. However, we decline to adopt a per se rule in this area, as this is a decision left to the sound discretion of the trial justices. State v. Gaspar, 982 A.2d 140, 147 (R.I. 2009).

his allegation that a witness was intoxicated).  The trial justice explained that he had "reviewed the drug treatment of at least hundreds, if not thousands of defendants over the years" and was "aware that some illicit drugs * * * may remain in the human body and its bloodstream for days, even weeks after consumption."  Without an evidentiary link between the presence of illicit substances in Ceasar's blood and the effect of such substances on his cognitive abilities, the laboratory report had little value and fell far short of meeting the standard of intoxication set forth in Handy.  See Mattatall, 114 R.I. at 573, 337 A.2d at 233 (attempting to infer that an individual was intoxicated based on the presence of alcohol and narcotics in his system was "far too tenuous" to meet the Handy standard and, therefore, was properly excluded).

Finally, Bishop contends that the trial justice erred as a matter of law because he did not follow the procedure outlined in Handy.  We find this argument to be somewhat disingenuous; Bishop—the party who was attempting to introduce evidence of intoxication—never requested a Handy hearing in the first place.  Nevertheless, we note that, even if the trial justice did not precisely follow the voir dire procedures outlined in Handy, the conferences that the trial justice did conduct on the record indicate that he "act[ed] within the spirit" of Handy and its progeny. State v. Carvalho, 892 A.2d 140, 147-48 (R.I. 2006) (A hearing on defendant's motion in limine regarding possible intoxication "indicate[d] that the trial justice * * * act[ed] within the spirit of our decisions in the Handy line of cases.").  Specifically, the trial justice conducted a hearing on the state's motions in limine and held sidebar conferences when the state objected to defense counsel's cross-examination on drug use and possession.  During the conferences conducted on the record, the trial justice considered the arguments articulated for and against the admissibility of the evidence of the witnesses' possible intoxication, carefully weighed the proffered evidence,

and ultimately ruled that the evidence was inadmissible because it did not rise "to the level of intoxication." We hold this to be sufficient. See id. 147-48.[10]

## B

## Admission of Parole Status

Bishop also argues that the trial justice abused his discretion by allowing testimony about Bishop's parole status. Bishop maintains that this evidence should have been excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence, because any probative value it may have had was substantially outweighed by its prejudicial wallop. Specifically, Bishop challenges: (1) Det. Sgt. Bentsen's testimonial references that Degnan was Bishop's parole officer and that Bishop was arrested on a parole-detention warrant; (2) Degnan's testimony that Bishop tested positive for alcohol at his last meeting, in violation of the conditions of his parole, and that Bishop failed to report to Degnan on the Monday following the murder; (3) testimony that Bishop was required to catalog his every location and associates; and (4) references to the fact that Bishop's DNA was taken at the ACI. Bishop maintains that those references to his parole status were immaterial, redactable, superfluous, and unduly prejudicial. We disagree.

Before admitting otherwise probative evidence, a trial justice must carefully consider the relevance of the evidence relative to its potential prejudicial effect, pursuant to Rule 403. Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

---

[10] Bishop also argues that the trial justice erred by excluding this evidence on relevancy grounds. Although the trial justice did say that he was excluding the evidence on relevancy grounds, after a review of the record, we are convinced that the trial justice came to the conclusion that the Handy standard was not satisfied, even if he did not precisely articulate it. Accordingly, we are not confronted with a case in which the trial justice has excluded intoxication evidence on relevancy grounds alone. See Carrera, 528 A.2d at 334 ("[I]t would be error for the trial justice to prohibit this line of questioning [regarding a witness's drug use at the time of an incident at issue] on relevance grounds alone.").

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This Court has said that "a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly"; only when such evidence demonstrate mere marginal relevance and enormous unfair prejudice should the trial justice exclude it. State v. DeJesus, 947 A.2d 873, 883 (R.I. 2008).

After a carefully measured and thoughtful analysis, we are of the firm opinion that the trial justice did not abuse his discretion in permitting the references to Bishop's parole status. In considering the motions in limine, the trial justice explained that evidence of Bishop's parole status was "highly relevant" and "needed by the state to prove its case." Specifically, he explained that the evidence regarding Bishop's parole status was relevant to explain Bishop's "opportunity," including "his whereabouts at the time of the crimes," as well as "his knowledge, identity, and intent" regarding June 27, 2007. Indeed, the evidence regarding Bishop's parole status was relevant to explain how the police detectives identified him as a suspect. For example, the discrepancies in Bishop's travel logs for the night of the home invasion were probative, not only of his whereabouts at the time, but also of his opportunity to commit the crimes and his attempts to cover his tracks in the aftermath of his criminal activity. Also, Bishop's uncharacteristic failure to report to his parole officer as scheduled, approximately five days after the murder, was certainly probative of his consciousness of guilt. Thus, the trial justice did not abuse his discretion in concluding that evidence of Bishop's parole status was highly relevant and probative to show Bishop's opportunity, knowledge, identity, and intent regarding the June 27, 2007, incident. See State v. Mlyniec, 15 A.3d 983, 997 (R.I. 2011) ("It is within the sound discretion of the trial justice whether to admit or exclude evidence under Rule 403." quoting State v. John, 881 A.2d 920, 927 (R.I. 2005)).

Further, the trial justice was careful to mitigate any prejudicial impact that evidence of Bishop's status as a parolee might have had. The trial justice ordered that Bishop's "parole status w[ould] only be admitted for limited purposes, such as proving opportunity, knowledge, identity, and intent regarding the June 27-28, 2007 incident," and he instructed the jury as to that. Additionally, in assessing potential prejudice, the trial justice determined that Bishop's parole status was factually connected to the crimes charged, and was so intertwined with the facts that it became part and parcel of the entire case, such that the probative value substantially outweighed the danger of prejudicial harm. See State v. Woodson, 551 A.2d 1187, 1191 (R.I. 1988) (probative value substantially outweighed undue prejudice when the use of drugs at issue was factually connected to the crimes charged and "so intertwined with the facts that it became part and parcel of the entire case"). Specifically, the trial justice considered the state's proffer—based on "the discovery materials including the grand jury presentation"—that (1) Bishop "was arrested on a parole warrant"; (2) Bishop "gave a statement to the police on" the day he was arrested, in which he made "several references to his parole status and the parole logs"; (3) Bishop's parole logs, which were seized at Reine's house pursuant to a warrant, reflected that Bishop left Reine's house less than two hours before the incident in question; (4) Bishop did not report to his parole officer on the Monday after the incident, and there was "substantial evidence that the reason [he] failed to report [wa]s because he suffered a serious injury to his head"; (5) Turchetta was to testify that Reine called him on the morning after the murder to ask him for a doctor, explaining that Bishop "c[ould not] go to [just any doctor] because of his probation [sic]"; and (6) Antonelli, who hired Bishop as a condition of his parole, was to testify that "shortly after the murder, [Bishop] asked him to falsely confirm that Bishop had been injured

while at work."[11] See DeJesus, 947 A.2d at 883 (explaining that evidence is not to be excluded under Rule 403 unless it "is marginally relevant and enormously prejudicial"). Based on this, the trial justice concluded that the evidence of Bishop's parole status was relevant, and the probative value was not substantially outweighed by its potential undue prejudice.

Moreover—and although we conclude that the prejudicial effect of this evidence was minimal—we recognize that in addition to carefully weighing the risk of unfair prejudice, the trial justice, in a pretrial order, provided "adequate safety measures * * * to protect defendant" from undue prejudice. See Woodson, 551 A.2d at 1193. For one, he barred the introduction of the circumstances of Bishop's previous incarceration. Indeed, although the trial justice allowed testimony that Bishop had been previously convicted of a felony, he limited testimony regarding the character of the crime, which was first-degree murder. Further, the trial justice "ordered that the state instruct all of its witnesses that they will not testify to [Bishop]'s incarceration, detention, residence in prison or jail, nor the offenses for which he ha[d] served prison time." The trial justice was also careful to restrict any reference that it was individuals at the ACI who recognized the composite sketch to be Bishop.

The trial justice further safeguarded against the risk of unfair prejudice by issuing an appropriate cautionary instruction to the jury about the very limited purpose for which the evidence concerning Bishop's parole was offered. Specifically, the trial justice instructed that the evidence could not be used to support a conclusion that Bishop was of bad character and, thus, may have committed the offenses for which he was on trial; the evidence could be used

---

[11] Ultimately, Bishop's police statement was never admitted into evidence, and while both Antonelli and Turchetta testified at Bishop's trial, Antonelli never testified that he hired Bishop as a condition of his parole and Turchetta never testified that Reine told him that Bishop "c[ould not] go to [just any doctor] because of his probation [sic]," although he did testify that Reine called him to seek medical assistance for Bishop.

only for limited purposes, such as proving opportunity—for example, his whereabouts at the time of the crimes at issue to which the parole logs speak—or to explain his opportunity, plan, or identity regarding the incident in question.[12] See State v. Ciresi, 45 A.3d 1201, 1214 (R.I. 2012) ("In cases * * * in which the evidence in question can be used for multiple purposes, some of which are permissible and others of which are not, the trial justice should issue specific instructions to the jury explaining 'the limited purpose [or purposes] for which the jury may consider it.'" quoting State v. Garcia, 743 A.2d 1038, 1052 (R.I. 2000)).

---

[12] The trial justice's cautionary instructions provided that:

> "I again instruct you that if there is evidence that the defendant was on parole at the time of the incident in question, you may not use such evidence to conclude that he may be responsible for any of the offenses for which he is now on trial. The fact that the defendant may have been previously incarcerated or has been on parole must not prejudice you into thinking that he may have committed the crimes for which he is now on trial before you.
>
> "If the State offers such evidence, it will be for a very limited purpose, and that is to provide a possible explanation for the defendant's actions subsequent to the date of the alleged offenses."

The trial justice made the same point during the final jury instructions:

> "During the trial of this case, there was evidence offered that the defendant was on parole as of late June, 2007. I again instruct you that you may not use such evidence to prejudice you into thinking that he may have committed the crimes for which he is now on trial. I allowed such evidence for the limited purpose of providing context for the defendant's actions subsequent to the date of the alleged offense and for whatever value, if any, it has in showing defendant's opportunity, plan, or identity."

In addition, with regard to the reference to Det. Frazier obtaining a DNA sample from Bishop at the ACI, the trial justice instructed:

> "The last question and answer * * * concerning the location at which detective Frazier took the second buccal swab from the defendant are stricken, and it is not part of the evidence. If the defendant was detained as of July 6, 2007, that is of no concern to you and it has no evidentiary value. It is not evidence and not even a suggestion that Mr. Bishop may have been responsible for the commission of the offenses for which he is now on trial. You must make your decision based upon the evidence which I allow you to hear and not speculation."

Although Bishop argues that the cautionary instructions did little to undo the harm caused by the frequent references to his parole status, in this case, there is no indication that the jury failed to obey the cautionary instruction. See State v. Barbosa, 908 A.2d 1000, 1005 (R.I. 2006) ("[U]nless some indication exists that the jury failed to obey the cautionary instruction given" by the trial justice, this Court must assume that the jury followed the instruction as given.). Therefore, considering the full scope and weight of the testimonial evidence, as well as the trial justice's specific and timely cautionary instructions to the jury, we hold that the trial justice's evidentiary ruling to admit this evidence of defendant's parole status was wholly within his discretion under Rule 403, because this evidence was relevant and not unduly prejudicial.

Finally, given the quantity and quality of the evidence inculpating Bishop, even if there were error—and it is our firm opinion that there was none—it would have been harmless beyond a reasonable doubt. See Ciresi, 45 A.3d at 1215 (admission of uncharged bad conduct was harmless in light of the overwhelming evidence presented against the defendant at trial). Here, Claire and Ceasar both identified Bishop's picture from a photo array. Further, the DNA samples collected from the physical evidence at the crime scene matched the samples obtained from Bishop. In addition, the hairs harvested from the ski mask matched exemplars from Bishop's head. Moreover, Bishop testified on direct examination that he failed to seek medical aid because he did not wish to call attention to himself for fear that he would have to explain the incident to his parole officer, and defense counsel referred to Bishop's parole in his opening statement—that Bishop was "afraid about violating his parole"—and in his closing argument when he attempted to explain away Bishop's reluctance to report the incident or to seek medical assistance. Furthermore, Bishop's version of the incident was riddled with inconsistencies and was ultimately undercut by the testimony of Turchetta, who testified about Reine's telephone call

seeking medical assistance for Bishop, and that of Antonelli, who testified that Bishop asked him to lie on his behalf about the cause of his injuries. It is clear from the record that the weight of the evidence against Bishop was enormous.

## Conclusion

For the reasons set forth in the opinion, the judgment of the Superior Court is affirmed. The papers of the case are returned to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Alfred Bishop.

**CASE NO:**    No. 2009-173-C.A.
(K1/08-87A)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    June 18, 2013

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Edwin J. Gale

**ATTORNEYS ON APPEAL:**

For State:  Jane M. McSoley
        Department of Attorney General

For Defendant:  George J. West, Esq.